379 F.3d 641
 PUBLIC UTILITY DISTRICT NO. 1 OF GRAYS HARBOR COUNTY WASHINGTON, Plaintiff-Appellant,
v.
IDACORP INC., an Idaho corporation; Idaho Power Company, an Idaho corporation; IDACORP Energy L.P., a Delaware limited partnership, Defendants-Appellees.
 No. 03-35207.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 10, 2004.
 Filed August 10, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED William J. Ohle, Schwabe, Williamson & Wyatt, Portland, OR, for the plaintiff-appellant.
 Gordon E. Erspamer, Morrison & Foerster, Walnut Creek, CA, for the defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington; Robert J. Bryan, District Judge, Presiding, D.C. No. CV-02-05572-RJB.
 Before PREGERSON, THOMPSON, and CALLAHAN, Circuit Judges.
 PREGERSON, Circuit Judge.
 
 
 1
 This dispute arises out of the West Coast's recent energy crisis. The case involves contract-related claims against energy wholesalers by a public utility which contends it was forced to pay exorbitant prices for electricity. The utility's case was dismissed by the district court because its claims were found to be preempted. For the reasons discussed below, we affirm in part and remand.
 
 BACKGROUND[1]
 
 2
 Appellant Public Utility District No. 1 of Grays Harbor County, Washington ("Grays Harbor") is a public utility district that provides retail electric power services to residential, commercial, and government customers within Grays Harbor County, Washington. Appellees Idaho Power Company and IDACORP Energy L.P. market and sell electric power in the wholesale markets of the Pacific Northwest. Appellee IDACORP Inc. is the holding company for both Idaho Power Company and IDACORP Energy L.P., and it is also the general partner of IDACORP Energy L.P.
 
 
 3
 At the center of this dispute is a contract for power. On or about March 19, 2001, Grays Harbor entered into a 20 megawatt purchase transaction with Idaho Power Company for the purchase of electric power from October 1, 2001 through March 31, 2002, at the "market rate," which turned out to be $249 per megawatt hour. In or around June 2001, Idaho Power Company assigned all of its rights and obligations under the contract to IDACORP Energy L.P. Subsequently, IDACORP Energy L.P. delivered the power under the contract, and Grays Harbor paid IDACORP Energy L.P. $21,757,620 for the power.
 
 
 4
 This contract was negotiated during a time — the summer and winter of 2000-2001 — when the West Coast was experiencing extreme power shortages and price volatility. These shortages resulted in numerous blackouts in California and threatened blackouts in the Northwest. According to Grays Harbor, this situation was allegedly caused by "dysfunctional markets, market manipulation and the intentional withholding of generation capacity from the market."
 
 
 5
 On or about October 10, 2002, Grays Harbor filed suit against IDACORP, Inc.; Idaho Power Company; and IDACORP Energy L.P. in Washington state court. In the complaint, Grays Harbor sought rescission or reformation of the contract based on four theories — mutual mistake, unilateral mistake, duress, and unconscionability. The complaint also asserted a claim for unjust enrichment against IDACORP Inc. and IDACORP Energy L.P.[2] In essence, the complaint alleges that the market rate of $249 per megawatt hour price was agreed to only because Grays Harbor believed that the rate was based on a properly functioning market, when in fact the price resulted from a dysfunctional, manipulated market.
 
 
 6
 As to the unjust enrichment claim, the complaint seeks restitution from IDACORP Inc. and IDACORP Energy L.P. in an amount "equal to the difference between $249 per megawatt hour and the fair value for the electric power delivered by IDACORP Energy L.P." pursuant to the contract. Alternatively, the complaint seeks rescission or reformation of the contract "to a price that reflects a fair price absent dysfunction, manipulation and the intentional withholding of electric power and restitution from defendants jointly and sever [ally] in an amount equal to the difference between $249 per megawatt hour and the fair value for the electric power" delivered under the contract.
 
 
 7
 On November 4, 2002, the defendants removed the case to the United States District Court for the Western District of Washington. On November 12, 2002, the defendants filed a motion to dismiss, which was ultimately heard on January 24, 2003. At the hearing on January 24, 2003, the district court issued an oral ruling dismissing the complaint. The district court concluded that it did not have jurisdiction to resolve the issues raised in the complaint. The court explained that the relief sought would require the court to determine a fair price and that "[the Federal Energy Regulatory Commission] has preempted the field of determining fair value of power...." The judge stated, "all of the relief requested in the complaint would require this Court to undermine the Congressional scheme of uniform regulation of rates."[3] On January 28, 2003, the court issued a minute order and a judgment, dismissing the complaint. Grays Harbor filed a timely notice of appeal on February 27, 2003.
 
 ANALYSIS
 A. Standard of Review
 
 8
 A dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is reviewed de novo. Libas Ltd. v. Carillo, 329 F.3d 1128, 1130 (9th Cir.2003). A dismissal for failure to state a claim may be affirmed on any basis supported in the record. Ove v. Gwinn, 264 F.3d 817, 821 (9th Cir.2001). Review is limited to the contents of the complaint and all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Id.
 
 
 9
 Denial of leave to amend, which we discuss hereafter, is reviewed for abuse of discretion, United States ex rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1051 (9th Cir.2001); "[d]ismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment," Eminence Capital, L.L.C. v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir.2003).
 
 B. Discussion
 
 10
 The arguments raised on appeal all involve the scope of preemption in the energy context and how that preemption applies to Grays Harbor's contract claims.[4] As an initial matter, it is clear that the Federal Power Act (the "FPA") grants FERC "`exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce.'" Transmission Agency of N. Cal. v. Sierra Pac. Power Co., 295 F.3d 918, 928 (9th Cir.2002) ("TANC") (quoting New England Power Co. v. New Hampshire, 455 U.S. 331, 340, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982)); see also 16 U.S.C. §§ 824-824m. Through the FPA, "`Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction.... This was done in the Power Act by making [FERC] jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States.'" Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 966, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986) (quoting Fed. Power Comm'n v. S. Cal. Edison Co., 376 U.S. 205, 215-16, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964)). This power includes the exclusive authority to determine the reasonableness of wholesale rates. See Miss. Power & Light Co. v. Miss. ex rel. Moore, 487 U.S. 354, 371, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988); see also 16 U.S.C. § 824e(a) (stating that FERC shall determine the just and reasonable rate when it finds that "any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential...."). To the extent that it bars states from acting within the zone of FERC's authority, this exclusive jurisdiction is grounded in the Supremacy Clause of the Constitution. See Miss. Power & Light Co., 487 U.S. at 371, 108 S.Ct. 2428; U.S. Const. art. VI, cl. 2; see also Duke Energy Trading & Mktg., L.L.C. v. Davis, 267 F.3d 1042, 1055 (9th Cir.2001) (noting that a preemption claim involving state actions that conflict with the Federal Power Act are properly understood as predicated on the Supremacy Clause).
 
 
 11
 There are three preemption-related theories that require this case to be dismissed. They are: field preemption, conflict preemption, and the filed rate doctrine.[5] We address them separately below.
 
 1. Field Preemption
 
 12
 "Field preemption occurs when the federal statutory scheme is sufficiently comprehensive to infer that Congress left no room for supplementary regulation by the states." Gadda, 363 F.3d at 869. "When the federal government completely occupies a given field or an identifiable portion of it ..., the test of preemption is whether `the matter on which the state asserts the right to act is in any way regulated by the federal government.'" Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 212-13, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 236, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). "When considering preemption, no matter which type, `[t]he purpose of Congress is the ultimate touchstone.' "Ting v. AT&T, 319 F.3d 1126, 1136 (9th Cir.2003) (quoting Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)).
 
 
 13
 Grays Harbor's basic argument in this respect is that its complaint merely alleges facts that under state common law would allow the court to grant the equitable remedies of rescission or reformation and that the FPA does not necessarily grant FERC exclusive jurisdiction over all power-related contract disputes. Grays Harbor emphasizes the fact that its complaint is not about rates charged for power but rather about contract formation. Moreover, Grays Harbor argues, the congressional intent to preempt its action is especially lacking in the deregulated power markets, where prices are negotiated between parties and the rates are not filed and approved in advance by FERC. FERC is only authorized to provide refunds plus interest for a prospective period, 16 U.S.C. § 824e(b);[6] this type of relief, Grays Harbor contends, is inadequate in a deregulated market where the prices are not set in advance.[7]
 
 
 14
 The Supreme Court has provided some support for Grays Harbor's argument: "questions of exclusive federal jurisdiction and ouster of jurisdiction of state courts are, under existing jurisdictional legislation, not determined by ultimate substantive issues of federal law. The answers depend on the particular claims a suitor makes in a state court — on how he casts his action." Pan Am. Petroleum Corp. v. Superior Court, 366 U.S. 656, 662, 81 S.Ct. 1303, 6 L.Ed.2d 584 (1961). Here, Grays Harbor has "cast its action" as a simple question of contract formation. But Grays Harbor's arguments ignore the fundamental thrust of its complaint. In its current form, Grays Harbor's complaint seems to require the district court, at some point, to determine the fair price of the electricity that was delivered under the contract. This determination is clearly within FERC's jurisdiction for determining the reasonableness of wholesale rates. Miss. Power & Light Co., 487 U.S. at 371, 108 S.Ct. 2428; see also 16 U.S.C. § 824e(a). At the very least, the requested relief intrudes on an "identifiable portion" of a field that the federal government has occupied and addresses a matter that is "in any way regulated by the federal government." See Pac. Gas & Elec. Co., 461 U.S. at 212-13, 103 S.Ct. 1713.
 
 
 15
 It may be true that the district court could decide simply whether, for instance, there was duress or mutual mistake such that reformation or rescission may be appropriate, i.e., whether there was a contract formation problem. In fact, FERC has stated that such a determination, by itself, may be more appropriately resolved in the courts. See Villages of Edgerton & Montpelier, Ohio v. Ohio Power Co., 49 F.E.R.C. ¶ 61,306, 1989 WL 263107 (Dec. 11, 1989) ("Unlike most contractual disputes that come before us, this case involves a question not of contract interpretation but of whether there is a contract. With respect to the issue of whether Ohio Power made a legally enforceable commitment to supply the Villages' full requirements service, we believe that generally the courts would be the appropriate forum for deciding whether two parties entered into a contract."). But the district court could do no more without intruding into an area of exclusive FERC authority. See In re Cal. Wholesale Elec. Antitrust Litig., 244 F.Supp.2d at 1077 ("[I]n order to resolve Plaintiff's claims and provide it the damages it seeks, the Court would be expressly required to assume a hypothetical rate different from that actually set by FERC. This, the Court cannot do.") (quotation marks and citation omitted). Thus, the situation is analogous to that in Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 580, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981), where the Supreme Court held: "the mere fact that respondents brought th[eir] suit under state law [does] not rescue it, for when [C]ongress has established an exclusive form of regulation, there can be no divided authority over interstate commerce. Congress here has granted exclusive authority over rate regulation to the Commission." (quotation marks and citation omitted).[8]
 
 
 16
 The fact that the rates at issue in this case are market based does not alter this conclusion. Idaho Power Company's authority to charge market-based rates comes from FERC. Before allowing Idaho Power Company to charge market-based rates, FERC first confirmed that Idaho Power Company did not have, or had adequately mitigated, market power in generation and transmission and could not erect other barriers to entry. Idaho Power Co., 78 F.E.R.C. ¶ 61,343, 1997 WL 139585, at *1 (Mar. 27, 1997). Further, the ability to charge market-based prices comes with certain filing requirements, including providing FERC with individual service agreements for contracts such as the one at issue here. See id. at *3. Even in the context of market-based rates, FERC actively regulates and oversees the setting of rates. Thus there is no indication — and Grays Harbor has provided no authority to support the contention — that market-based rates are not within FERC's exclusive jurisdiction over wholesale rates.
 
 
 17
 The fact that FERC can only grant prospective refunds similarly fails to alter the conclusion that Grays Harbor's claims are preempted. As the Supreme Court has stated:
 
 
 18
 Congress here has granted exclusive authority over rate regulation to the Commission. In so doing, Congress withheld the authority to grant retroactive rate increases or to permit collection of a rate other than the one on file. It would surely be inconsistent with this congressional purpose to permit a state court to do through a breach-of-contract action what the Commission itself may not do.
 
 
 19
 Ark. La. Gas Co., 453 U.S. at 580, 101 S.Ct. 2925. True, because FERC does not pre-approve specific market-based rates, the shift to such rates may mean that prospective refunds are an inadequate remedy. But this fact, by itself, does not change the scope of preemption regarding FERC's exclusive jurisdiction over wholesale rates.[9] See Ark. La. Gas Co., 453 U.S. at 584, 101 S.Ct. 2925 ("A finding that federal law provides a shield for the challenged conduct will almost always leave the state-law violation unredressed.").
 
 
 20
 Therefore, we find that Grays Harbor's claims are barred because of field preemption.
 
 2. Conflict Preemption
 
 21
 So-called "conflict preemption" exists "if there is an actual conflict between federal and state law, or where compliance with both is impossible." Gadda, 363 F.3d at 871; Pac. Gas & Elec. Co., 461 U.S. at 204, 103 S.Ct. 1713 ("Even where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law."). Perhaps most relevant to the case at hand, conflict preemption exists "where state law `stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Ting, 319 F.3d at 1136 (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). "Under the obstruction strand of conflict preemption, an aberrant or hostile state rule is preempted to the extent it actually interferes with the `methods by which the federal statute was designed to reach [its] goal.'" Ting, 319 F.3d at 1137 (quoting Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987)).
 
 
 22
 Grays Harbor argues that no actual conflict exists in this case that would require a finding of conflict preemption. But, by asking the court to set a fair price, Grays Harbor is invoking a state rule (specifically, contract law) that would interfere with the method by which the federal statute was designed to reach it goals (specifically, FERC regulation of wholesale electricity rates).[10] To permit Grays Harbor to receive in its court action what is essentially a refund would create a conflict with FERC's authority over wholesale rates. And such a result would make state law stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress under the FPA.
 
 
 23
 Therefore, we find that conflict preemption applies here.
 
 3. The Filed Rate Doctrine
 
 24
 Closely related to these preemption issues is the "filed rate doctrine."[11] This doctrine, applied in a variety of contexts, is grounded in an agency's exclusive rate-setting authority. TANC, 295 F.3d at 929-30. "At its most basic, the filed rate doctrine provides that state law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question." Id. at 929; see also Ark. La. Gas Co., 453 U.S. at 577, 101 S.Ct. 2925 (under the filed rate doctrine, "[n]o court may substitute its own judgment on reasonableness for the judgment of the Commission."). "[T]he filed rate doctrine has prohibited not just a state court (or a federal court applying state law) from setting a rate different from that chosen by FERC, but also from assuming a hypothetical rate different from that actually set by FERC." TANC, 295 F.3d at 930.
 
 
 25
 The relief sought by Grays Harbor would require the court to set damages by assuming a hypothetical rate, the "fair value," in violation of the filed rate doctrine. See TANC, 295 F.3d at 933 (finding that claim that rates were procured by fraud are barred under the filed rate doctrine because any award of damages would interfere with FERC's authority).
 
 
 26
 Grays Harbor describes at length the reasons why the filed rate doctrine should not apply here, but its arguments all center on the market-based nature of the rates at issue in this case. Grays Harbor contends that the $249 per megawatt hour that was charged was not "filed" with FERC and approved by FERC before it was charged. In short, according to Grays Harbor, FERC simply did not set any rates. Grays Harbor contends that to apply the filed rate doctrine to market-based rates that have not been filed with FERC would be an unwise and unprecedented expansion of the doctrine.
 
 
 27
 But, as described above, the market-based rate regime established by FERC continues FERC's oversight of the rates charged. FERC only permits power sales at market-based rates after scrutinizing whether "the seller and its affiliates do not have, or have adequately mitigated, market power in generation and transmission and cannot erect other barriers to entry." Idaho Power Co., 1997 WL 139585, at *1. According to FERC, these conditions assure that the market-based rates charged comply with the FPA's requirement that rates be just and reasonable. Cal. ex rel. Bill Lockyer v. British Columbia Power Exch. Corp., 99 F.E.R.C. ¶ 61,247, 2002 WL 32035504, at *11 (May 31, 2002); see also 16 U.S.C. § 824d(a). This oversight is ongoing, in this case requiring Idaho Power Company to provide notice of any change in status, to file an updated market analysis every three years, and to file various sales agreements and transaction summaries.
 
 
 28
 Idaho Power Co., 1997 WL 139585, at *3. Further, FERC contends that such procedures effectively constitute review of rates prior to their implementation. See British Columbia, 2002 WL 32035504, at *12 ("Prior review consists, however, not of the particular prices agreed to by willing buyers and sellers. Rather, it consists of analysis to assure that the seller lacks or has mitigated market power so that its prices will fall within a zone of reasonableness."). FERC has clearly stated its belief that these procedures "satisfy the filed rate doctrine for market-based rates...." Id.; see also San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. into Mkts. Operated by the Cal. Indep. Sys. Operator Corp. & the Cal. Power Exch., 96 F.E.R.C. ¶ 61,120, 2001 WL 1704964, at *9 n. 31 (July 25, 2001) ("[T]he rationales underlying the filed rate doctrine apply to market-based rates."; "Thus, the filed rate doctrine and its corollary, the rule against retroactive rate-making, apply to market-based rates."). Grays Harbor, on the other hand, provides no persuasive authority that the filed rate doctrine does not apply to market-based rates. Cf. In re Cal. Wholesale Elec. Antitrust Litig., 244 F.Supp.2d at 1079 ("Most damning to Plaintiff's argument is the simple fact that case law does not support its contentions that the market-based rate system circumvents the filed rate doctrine.").
 
 
 29
 Therefore, while market-based rates may not have historically been the type of rate envisioned by the filed rate doctrine, we conclude that they do not fall outside of the purview of the doctrine. Therefore, the relief sought by Grays Harbor is barred under the filed rate doctrine.
 
 4. Leave to Amend
 
 30
 In dismissing the case, the district court concluded: "It's hard for me to see now how a repleading would make any difference...." We disagree. A complaint that merely seeks declaratory relief as to contract formation issues would not necessarily intrude upon the rate-setting jurisdiction of FERC. Cf. Pan Am. Petroleum, 366 U.S. at 662, 81 S.Ct. 1303 ("[Q]uestions of exclusive federal jurisdiction and ouster of jurisdiction of state courts ... depend on the particular claims a suitor makes in a state court — on how he casts his action."). For instance, the district court could determine that, because of wide-spread market manipulation and dysfunction, the contract was formed under circumstances of unilateral or mutual mistake.[12] As noted above, even FERC has acknowledged that such questions may be resolved by a court. See Villages of Edgerton & Montpelier, 1989 WL 263107 ("With respect to the issue of whether Ohio Power made a legally enforceable commitment to supply the Villages' full requirements service, we believe that generally the courts would be the appropriate forum for deciding whether two parties entered into a contract.").
 
 
 31
 Therefore, we grant Grays Harbor leave to amend. See Fed.R.Civ.P. 15(a) ("[L]eave [to amend] shall be freely given when justice so requires."); Eminence Capital, 316 F.3d at 1052 ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment."). Any amended complaint must be narrowly drafted to seek declaratory relief only as to issues of contract formation.[13] More specifically, it must not require the district court to make a determination as to what the "fair" rate would have been. Should Grays Harbor eventually prevail and receive a determination that no valid contract exists, Grays Harbor may not turn to the district court for monetary relief. Grays Harbor's only avenue for relief at that point, if any exists, would be with FERC.
 
 CONCLUSION
 
 32
 We affirm district court's dismissal of Grays Harbor's complaint. We remand to allow Grays Harbor the opportunity to amend its complaint.
 
 
 33
 AFFIRMED IN PART; REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Because this is an appeal of a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), the facts set forth here assume the truth of the allegations in the complaint
 
 
 [2]
 In support of this particular claim, Grays Harbor alleges that the assignment of the contract was "illegal, void and unenforceable...." Grays Harbor presses the issue of the assignment in its opening brief but essentially abandons the issue in its reply. The issue was settled when, after the filing of the complaint, FERC officially approved the assignmentIdaho Power Co., 102 F.E.R.C. ¶ 61,213, 2003 WL 933594, at *1 (Feb. 26, 2003).
 
 
 [3]
 In so ruling, the district court cited with approvalIn re California Wholesale Electricity Antitrust Litigation, 244 F.Supp.2d 1072 (S.D.Cal.2003). That opinion addresses issues that are essentially identical to those raised in this case. See id. The appeal in that case was argued to another panel of this court on June 14, 2004, in San Francisco.
 
 
 [4]
 In a footnote at the end of their brief, the appellees request that, should the panel find that Grays Harbor's claims are not preempted, the panel should nevertheless affirm dismissal of the complaint based on the failure to state a claim under state law. But neither party seriously addresses these arguments on appeal
 
 
 [5]
 Field and conflict preemption stand in contrast to express preemptionSee Gadda v. Ashcroft, 363 F.3d 861, 869-71 (9th Cir.2004). Express preemption is not at issue in this appeal.
 
 
 [6]
 The relevant provision allows FERC to establish a "refund effective date" when adjusting rates in order to make them just and reasonable. 16 U.S.C. § 824e(b). This date "shall not be earlier than the date 60 days after the filing of [the] complaint nor later than 5 months after the expiration of such 60-day period."Id. "At the conclusion of any proceeding under this section, the Commission may order the public utility to make refunds of any amounts paid, for the period subsequent to the refund effective date ..., in excess of those which would have been paid under the just and reasonable rate...." Id. (emphasis added).
 
 
 [7]
 Grays Harbor also argues that there is a presumption against preemption. "We apply a presumption against federal preemption unless the state attempts to regulate an area in which there is a history of significant federal regulation."Gadda, 363 F.3d at 869. This presumption is almost certainly not applicable here because the federal government has long regulated wholesale electricity rates. See Fed. Power Comm'n v. S. Cal. Edison Co., 376 U.S. 205, 213, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964) (discussing the development of the Federal Power Act of 1935).
 
 
 [8]
 Arkansas Louisiana Gas Co. arose under the Natural Gas Act. But, because the FPA and the Natural Gas Act are "substantially identical," there is an "established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes." Ark. La. Gas Co., 453 U.S. at 577 n. 7, 101 S.Ct. 2925.
 
 
 [9]
 The district court alluded to this practical problem in the oral ruling: "[I]t sounds to me like FERC's scheme, which is where the remedy should lie here, may be some what broken and not very practical in order to get relief ... under the circumstances that the plaintiffs allege in their complaint...."
 
 
 [10]
 In fact, FERC has investigated and rejected the possibility of refunds for "spot market" bilateral sales in the Pacific NorthwestSee Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity at Wholesale into Elec. Energy and/or Capacity Mkts. in the Pac. N.W., 103 F.E.R.C. ¶ 61,348, 2003 WL 21480253, at *6-11 (June 25, 2003). It appears as though Grays Harbor took part in these FERC proceedings and attempted to have the contract at issue in this suit included within the definition of the "spot market" transactions for which refunds were considered. See Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity at Wholesale into Elec. Energy and/or Capacity Mkts. in the Pac. N.W., 96 F.E.R.C. ¶ 63,044, 2001 WL 1116440, at *9, *38 n. 94, *44 (Sept. 24, 2001). FERC rejected refunds because it concluded, after weighing a number of factors, that "the directing of refunds in this proceeding would not result in an equitable resolution of the matter." Puget Sound Energy, 2003 WL 21480253, at *11.
 
 
 [11]
 In fact, "[w]hen the filed rate doctrine applies to state regulators, it does so as a matter of federal pre-emption through the Supremacy Clause."Entergy La., Inc. v. La. Pub. Serv. Comm'n, 539 U.S. 39, 47, 123 S.Ct. 2050, 156 L.Ed.2d 34 (2003).
 
 
 [12]
 In supplemental briefing, the appellees argue that seeking such declaratory relief here would represent an improper collateral attack on a FERC decision. Under the FPA, a party aggrieved by a FERC order must obtain review of that order by petitioning the court of appeals; that party cannot attack the order by way of a new lawsuit in federal courtSee 16 U.S.C. § 825l (b); see also City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 335-36, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958). The appellees premise their argument on the fact that Grays Harbor advanced arguments regarding contract formation before FERC in proceedings in which FERC declined to provide refunds. See Puget Sound Energy, 2001 WL 1116440, at *9, *38 n. 94, *44; Puget Sound Energy, 2003 WL 21480253, at *11. At oral argument, the appellees attempted to direct the Court to a portion of the Puget Sound Energy proceedings in which contract formation claims made by Grays Harbor were explicitly considered and rejected. But a review of the document cited, paragraph 68 of FERC's order of November 10, 2003, Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity at Wholesale into Elec. Energy and/or Capacity Mkts. in the Pac. N.W., 105 F.E.R.C. ¶ 61,183, 2003 WL 22680031 (Nov. 10, 2003), reveals no such finding. A finding such as that quoted by the appellees at oral argument appears in paragraph 68 of FERC's order of November 10, 2003, in Nevada Power Company v. Enron Power Marketing, Inc., 105 F.E.R.C. ¶ 61,185 (Nov. 10, 2003), but it does not appear that Grays Harbor was a party to the Nevada Power Company proceedings.
 In the absence of a finding by FERC in the Puget Sound Energy proceedings such as it made in the Nevada Power Company proceedings, we do not believe that declaratory relief as to contract formation is an impermissible collateral attack on FERC's order in the Puget Sound Energy proceedings. A finding that no contract existed between the parties here does not contradict, and would not call into question, FERC's conclusion that it could not equitably provide refunds for spot market transactions in the Pacific Northwest.
 
 
 [13]
 Because such a complaint would go solely to issues of contract formation, the so-calledMobile-Sierra standards, which relate to post-hoc contract modification by FERC, are not relevant. See United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); Fed. Power Comm'n v. Sierra Pac. Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956); see also Nev. Power Co. v. Enron Power Marketing, Inc., 103 F.E.R.C.¶ 61,353, 2003 WL 21485862, at *2 (June 26, 2003).
 
 
 
 34
 CALLAHAN, Circuit Judge, dissenting, in part.
 
 
 35
 I agree with the majority's opinion, but for the decision to allow Grays Harbor to amend its complaint.
 
 
 36
 My colleagues carefully and correctly show that Grays Harbor's contract-related claims are preempted because they trigger the exclusive jurisdiction of FERC. They explain that the Federal Power Act ("FPA") delegates to FERC "exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce." New England Power Co. v. New Hampshire, 455 U.S. 331, 340, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982). They, however, would permit Grays Harbor to amend its complaint because offering declaratory relief as to contract formation "would not necessarily intrude upon the rate-setting jurisdiction of FERC."
 
 
 37
 I question the factual basis of this assertion. Grays Harbor cannot escape preemption by restating a claim that is based on "dysfunctional markets, market manipulation and the intentional withholding of generation capacity from the market." We recently held that a lawsuit by the State of California to enforce its unfair competition laws against producers that engaged in fraudulent energy transactions was preempted because California sought "to impose judicial remedies in addition to those that FERC may impose." People of California v. Dynegy, 375 F.3d 831 (9th Cir.2004). In addition, we have also rejected a suit for money damages "allegedly resulting from the operation of an interstate electricity intertie expressly approved by FERC, where the manner of operation was necessarily contemplated at the time of approval." Transmission Agency of Northern California v. Sierra Pacific Power Company, 295 F.3d 918, 928 (9th Cir.2002).
 
 
 38
 It is true that claims that are strictly contractual in nature are not preempted by the FPA, and that FERC has often declined jurisdiction over contractual matters that do not involve FERC's expertise. See Gulf States Utilities v. Alabama Power Co., 824 F.2d 1465 (5th Cir.1987) (stating that "The FPA would preempt a claim that frustration[of purpose of a contract] occurs because of high rates; the FPA would not preempt a claim that frustration occurs by buying electricity from Southern at any price."); see also National Fuel Gas Supply Corporation, 27 F.E.R.C. ¶ 63,074 (June 15, 1984).
 
 
 39
 Nonetheless, here, the issues of contract formation are tightly intertwined with complex matters of federal energy regulation. This case calls to mind the famous ontological debate of whether the chicken begat the egg. Like the scrambled relationship of the chicken and the egg, it is impossible to sever the issues of state contract formation in this case from matters of federal energy regulation that are purely within the province of FERC.
 
 
 40
 Grays Harbor's claims of unilateral and mutual mistake are rooted in an allegation that the Pacific Northwest energy market was not functioning properly at the time of contract formation.[1] Even if the amended complaint would not require the court to set a fair rate, it would still require an inquiry into the functioning of the energy market. This is the kind of technical inquiry that is best left to FERC's expertise.
 
 
 41
 Furthermore, considering that we are an appellate court, it is wrong to hold that the district court abused its discretion in denying leave to amend the complaint when neither the plaintiff nor the district court itself were able to conceive of any meaningful claim that was not preempted. Grays Harbor did not request leave to amend to seek declaratory relief until after the possibility of such relief was proffered by the panel.
 
 
 42
 In sum, as the contract formation issues involved in the present case cannot be unscrambled from matters that fall within the sole jurisdiction of FERC, I dissent.
 
 
 
 Notes:
 
 
 [1]
 I note that these allegations conflict with the findings of the administrative law judge whose recommendations were considered by FERC in prior proceedings relating to these energy transactions. The judge determined that "evidence demonstrates that the Pacific Northwest market for spot sales of electricity was competitive and functional during the relevant period of time...."See Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement, 103 F.E.R.C. ¶ 61,348 (June 25, 2003). Therefore, it would be impossible for a court to take judicial notice of the market's dysfunction as this fact is apparently a matter that is disputed.