[Nos. B206881, B207189, B208946. Second Dist., Div. Three. May 26, 2010.]

In re ELECTRIC REFUND CASES.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part III. of the Discussion.

## Counsel

Brune & Richard, Laurie Edelstein, Randall T. Kim; Sidley Austin, Marie L. Fiala; Stephen L. Schirle and Mark Patrizio for Plaintiff and Appellant Pacific Gas and Electric Company.

Steptoe & Johnson, Lawrence P. Riff, Jay E. Smith; Russell C. Swartz and Leon Bass, Jr., for Plaintiff and Appellant Southern California Edison Company.

Hennigan Bennett & Dorman, J. Michael Hennigan, Laura Lindgren and Robert W. Mockler for Plaintiff and Appellant San Diego Gas & Electric Company.

Meyers, Nave, Riback, Silver & Wilson, Benjamin T. Reyes II, Geoffrey Spellberg, Joseph M. Quinn; Slover & Loftus and Robert D. Rosenberg for Defendant and Appellant Arizona Electric Power Cooperative, Inc.

**OPINION**

**ALDRICH, J.—**

## INTRODUCTION

The facts underlying this appeal concern the intricate realm of California's energy crisis of May 2000 to June 2001. The precise legal issue, however, is relatively straightforward: the exhaustion of administrative remedies doctrine. Plaintiffs and appellants are Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company (collectively referred to as the IOU's),[1] entities that bought electricity during the crisis. Defendant and respondent is Arizona Electric Power Cooperative, Inc. (Arizona), which sold electricity during the crisis.

In 2000, the IOU's initiated a proceeding before the Federal Energy Regulatory Commission (FERC), the federal agency charged with regulating transmission and sale of electric energy for resale in interstate commerce. FERC found that unjust and unreasonable rates had been charged during the crisis and ordered refunds from energy sellers, including Arizona. The problem with the order was that FERC's jurisdiction extended to "public utilities," which essentially were private sellers of energy. "Nonpublic entities," including governmental entities, were not subject to FERC's jurisdiction. Rural cooperatives like Arizona had historically been treated as "nonpublic entities" that were also not subject to FERC's jurisdiction. FERC nonetheless concluded that Arizona was subject to its order, not because Arizona was no longer a "nonpublic entity," but because FERC had jurisdiction over the subject matter of the dispute. Arizona appealed to the Ninth Circuit Court of Appeals, which agreed that FERC exceeded its jurisdiction when it held that Arizona was subject to its refund order. (*Bonneville Power Admin. v. F.E.R.C.* (9th Cir. 2005) 422 F.3d 908 (*Bonneville*).)

Unable to obtain a remedy against Arizona before FERC, and following *Bonneville*'s suggestion that a remedy might be found in a contract action, the

---

[1] Investor-owned utilities.

IOU's filed this state court action. Arizona demurred to the complaint on the ground, among others, that by failing to argue in the FERC proceedings that Arizona's "nonpublic" status should be changed, the IOU's failed to exhaust their administrative remedies. The trial court agreed and sustained the demurrer without leave to amend. The IOU's appealed. In the published portion of this opinion, we find that any failure of the IOU's to challenge Arizona's jurisdictional status did not implicate the exhaustion of administrative remedies doctrine. It was therefore error to sustain the demurrer on this ground. In the unpublished portion of this opinion, we find that there were no valid alternative grounds for dismissal of the IOU's action on demurrer. The judgment is therefore reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

I. *Factual background.*[2]

In 1996, our Legislature enacted Assembly Bill No. 1890 (1995–1996 Reg. Sess.) (Pub. Util. Code, § 330 et seq.), which deregulated California's electrical power markets.[3] The new scheme created the California Power Exchange Corporation (CalPX) and the California Independent System Operator Corporation (CalISO). (Pub. Util. Code, § 330, subd. (*l*)(1).)[4] CalPX operated a "clearinghouse" for daily and hourly auctions, or trades, of electricity. CalISO managed California's transmission grid and ensured an adequate and stable supply of energy. The IOU's supplied electrical power to California residents and businesses, and the IOU's were required to buy most of their power supply through CalPX and CalISO.[5]

The CalPX auctions resulted in a single market clearing price that applied to all sellers and buyers, even if some sellers would have sold power for less and some buyers would have bought it for more. In other words, all sellers received the market clearing price. *Bonneville* described the single-price auctions like this: "In a single-price auction, all of the bidders are paid the same price as was bid by the highest-priced seller whose electric energy was needed to 'clear the market' or balance the supply of electric energy against the demand for electric energy. As a result, all of the bidders in a particular hour in the spot market received the same price for their sales." (*Bonneville, supra*, 422 F.3d at p. 912.)

---

[2] We state the facts in accord with the usual standard of review.

[3] Before deregulation, IOU's were vertically integrated, meaning they were responsible for generation, transmission, and distribution of electricity. (*Public Utilities Com. of State, Cal. v. F.E.R.C.* (9th Cir. 2006) 462 F.3d 1027 [providing helpful background about Cal. electricity market].) After deregulation, the IOU's were required to divest generation plants.

[4] CalPX and CalISO were subject to regulation by FERC. (16 U.S.C. § 824(e); *Pacific Gas and Electric Co.* (Nov. 26, 1996) 77 F.E.R.C. ¶ 61,204, pp. 61,803–61,805.)

[5] If an energy shortfall occurred, CalISO could buy energy outside of the CalPX market.

FERC-approved tariffs governed the sale and purchase of electricity through the CalPX and CalISO markets. Rates for such sales had to be "just and reasonable" under the Federal Power Act (16 U.S.C. § 791a et seq.). (16 U.S.C. § 824d(a).) Each participant in the CalPX and CalISO markets had to execute a CalPX participation agreement and a CalISO scheduling coordinator agreement agreeing to abide by the tariffs. The CalPX participation agreement, prescribed by the CalPX tariff, provided, for example, that the market participant " 'will abide by and will perform all of the obligations under the [Cal]PX Tariff in respect of all matters set forth therein including, without limitation, all matters relating to the trading of Energy by it through the [Cal]PX markets . . . [and] billing payments.' "

From May 2000 to June 2001, California experienced an energy crisis caused by sustained high prices for electricity.[6] Rolling blackouts occurred in Northern California. Prices for electricity far exceeded prices in prior periods. Sellers, including Arizona, received these inflated market clearing prices. The unjust and unreasonable rates were passed through to the IOU's retail electric customers in California. Statutorily forced to buy power through CalPX and CalISO, some IOU's amassed crippling debt. CalPX collapsed in January 2001.

The crisis ended in June 2001, when FERC established a mitigated market clearing price, which essentially was a recalculated just and reasonable rate. (*San Diego Gas & Electric Co. v. Sellers of Energy* (June 19, 2001) 95 F.E.R.C. ¶ 61,418, p. 62,558 (hereafter *San Diego Gas & Electric Co.*).)

II.   *Procedural background.*

  A.   *Proceedings before FERC.*

    1.   *Background concerning FERC.*

The Federal Power Act (FPA), codified at title 16 United States Code section 824 et seq., governs FERC.[7] FERC has exclusive jurisdiction over the transmission of electric energy in interstate commerce and the sale of electric

---

[6] Market manipulation caused the high prices: "Sellers quickly learned that the California spot markets [(trades occurring a day ahead or same day)] could be manipulated by withholding power from the market to create scarcity and then demanding extremely high prices when scarcity was probable." (*Public Utilities Com. of State, Cal. v. F.E.R.C., supra,* 462 F.3d at p. 1039.) Manipulative tactics included shutting down power plants to create the illusion of scarcity. (*Ibid.*)

[7] The FPA was amended in 2005. Unless otherwise noted, we cite the version of the FPA in effect at the time of the underlying proceedings.

energy at wholesale in interstate commerce. (16 U.S.C. § 824(b).) All rates and charges made, demanded, or received by any "public utility" for or in connection with such transmissions and sales shall be "just and reasonable." (16 U.S.C. § 824d(a).) Any unjust and unreasonable sale is unlawful. (*Ibid.*) If FERC determines that an unjust and unreasonable rate has been charged or paid, it can determine the just and reasonable rate and order the public utility to make refunds. (16 U.S.C. § 824e.)

FERC's jurisdiction is limited to "public utilities." (16 U.S.C. § 824(b) & (e).) Confusingly, "public utilities" are essentially *private* sellers of energy. Expressly exempted from FERC's authority and jurisdiction are "nonpublic utilities," such as governmental entities. (16 U.S.C. § 824(f); see also *Bonneville, supra*, 422 F.3d at pp. 915–916.) Although not expressly exempted from FERC's authority, cooperatives such as Arizona that receive financing under the Rural Electrification Act of 1936 (REA; 7 U.S.C. § 901 et seq.)[8] are also outside of FERC's jurisdiction.[9] (*Dairyland Power Cooperative* (1967) 37 F.P.C. 12 (*Dairyland*).) This rule is referred to as the *Dairyland* exemption.

## 2. *The IOU's file a complaint.*

During California's energy crisis, on August 2, 2000, the IOU's[10] filed a complaint with FERC against sellers of electricity in the CalISO and CalPX markets. Notice of the complaint was filed in the Federal Register. (65 Fed.Reg. 48693 (Aug. 9, 2000).) Arizona formally intervened in the FERC proceeding in June 2001. FERC opened an investigation into the "justness and reasonableness of the rates and charges of public utilities that sell energy and ancillary services to or through the California ISO and PX" and into "whether the tariffs and institutional structures and bylaws of the California ISO and PX are adversely affecting the efficient operation of competitive wholesale electric power markets in California and need to be modified." (*San Diego Gas & Electric Co. v. Sellers of Energy* (Aug. 23, 2000) 92 F.E.R.C. ¶ 61,172, p. 61,603.) After finding that California's electrical market structure and rates were flawed (*San Diego Gas & Electric Co. v. Sellers of Energy* (Nov. 1, 2000) 93 F.E.R.C. ¶ 61,121, p. 61,370), FERC proposed price mitigation measures and refund liability and established a methodology

---

[8] The REA was established to provide electrical services to rural parts of the United States. The Rural Utilities Service (RUS) administered loans given under the REA. (7 U.S.C. § 6942.)

[9] The FPA was amended in 2005 to expressly exempt such entities: "No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 . . . ." (16 U.S.C. § 824(f).)

[10] San Diego Gas and Electric Company filed the complaint and Pacific Gas and Electric and Southern California Edison Company intervened.

for calculating refunds (*San Diego Gas & Electric Co. v. Sellers of Energy* (Mar. 9, 2001) 94 F.E.R.C. ¶ 61,245, p. 61,861).

FERC then issued an order on July 25, 2001, establishing "the scope of and methodology for calculating refunds related to transactions in the spot markets operated by" CalISO and CalPX during October 2, 2000, through June 20, 2001.[11] (*San Diego Gas & Electric Co. v. Sellers of Energy* (July 25, 2001) 96 F.E.R.C. ¶ 61,120, p. 61,499.) The order established a mitigated market clearing price, i.e., just and reasonable rates an unmanipulated market would have produced during the refund period. The order, however, did something more: transactions subject to refunds included sales by nonpublic entities. (*Ibid.*) The order thus encompassed all sellers of electricity, including sellers that were normally *outside* of FERC's jurisdiction, namely, governmental entities and rural cooperatives (Arizona) that received REA financing.

FERC explained its rationale for extending its jurisdiction: "The Commission has determined that all sellers of energy in the California ISO and PX spot markets should be subject to refund liability for the period beginning October 2, 2000. We have decided to extend refund liability to public and non-public utility sellers based on our review of the controlling law, the involvement of both types of sellers in the California centralized ISO and PX spot markets, and the equities of the situation. Non-public utility sellers as well as public utility sellers of electric energy in those California markets contributed to and benefitted from the dysfunctions that offered the possibilities for the market abuse under certain conditions, on which the call for refunds are based. In these circumstances, as discussed below, we conclude that although we do not have direct regulatory rate authority over power sales by non-public utilities, we do have authority to order them to abide by the market rules we have established and to make refunds of unjust and unreasonable rates for sales pursuant to those market rules." (*San Diego Gas & Electric Co. v. Sellers of Energy, supra,* 96 F.E.R.C. ¶ 61,120, p. 61,511.)

FERC characterized itself as having jurisdiction over the "subject matter of the affected [sales]," namely, "wholesale sales of electric energy in interstate commerce through a Commission-authorized and Commission-regulated centralized clearinghouse that set a market clearing price for all wholesale seller participants, including non-public utilities. Exempting transactions involving non-public utility sellers from refund scrutiny here would allow them to make such sales without regard to the just and reasonable standard that applies to the market clearing price administered . . . ." (*San Diego Gas & Electric Co. v. Sellers of Energy, supra,* 96 F.E.R.C. ¶ 61,120, p. 61,512.) "Our action

---

[11] FERC concluded that its refund authority did not extend to the summer period from May 1 to October 1, 2000. The Ninth Circuit later disagreed with that conclusion.

thus revises the market clearing prices that all market participants previously agreed to accept for their sales. In this context, we see no reason to treat nonpublic utility sellers differently, as they are receiving the same price, the just and reasonable market clearing price established pursuant to market rules approved by this Commission, that they expected to obtain for their wholesale sales into the centralized ISO and PX spot markets." (*Ibid.*)

B. *Arizona appeals FERC's July 25, 2001 order to the Ninth Circuit Court of Appeals*—Bonneville.

Arizona and governmental entities appealed to the Ninth Circuit, which reversed FERC's July 25, 2001 order insofar as it found it had refund authority over wholesale electric energy sales made by governmental entities and nonpublic utilities, including Arizona. (*Bonneville, supra*, 422 F.3d at p. 911.) After the court found that the FPA expressly limited FERC's authority to investigate rates and order refunds from a " 'public utility,' " the court considered the unique position of Arizona. *Bonneville* first noted that FERC had initially respected Arizona's historical status as a nonpublic entity: "FERC has, until its appellate brief in this proceeding, treated [Arizona] as a non-public utility. FERC has offered nothing in the record to support its change of position nor did its refund orders single out [Arizona] for treatment as a public utility. We cannot accept FERC's post-hoc rationalization for ordering refunds from [Arizona]. Consequently, in this proceeding we treat [Arizona] as a non-public utility but without prejudice to reclassification by FERC in a different proceeding." (*Id.* at pp. 917–918, fn. omitted.) *Bonneville* therefore held that the "retroactive imposition of a market price that effects a refund responsibility is a regulatory action that falls outside of FERC's jurisdiction with respect to non-public utilities and governmental utilities." (*Id.* at p. 920.)

C. *This state court action.*

Before filing the state court action, Pacific Gas and Electric Company, Southern California Edison, and the California Electricity Oversight Board filed, on March 16 and 21, 2006, complaints in federal court, which were dismissed in March 2007 for lack of federal subject matter jurisdiction. (*Pacific Gas and Electric v. Arizona Electric Power Coop.* (E.D.Cal. 2007) 479 F.Supp.2d 1113.)

The IOU's then filed, in April 2007, this state court complaint containing causes of action for (1) breach of contract, (2) anticipatory breach of contract, (3) unjust enrichment, (4) money had and received, and (5) through

(9) declaratory relief. The named defendants included Arizona.[12] The IOU's sought "to recover . . . the amounts that each Governmental Entity [(including Arizona)] received in excess of the lawful rates for its wholesale sales of electric power to the California IOUs in the [Cal]ISO and [Cal]PX markets."

Arizona demurred to the complaint. In its demurrer, Arizona pointed out that its exemption from FERC jurisdiction rested on agency doctrine rather than statute. Arizona therefore argued that the IOU's could have asked FERC to revisit Arizona's exempt status, but it did not. By failing to ask for revocation of the *Dairyland* exemption, the IOU's failed to exhaust their administrative remedies, Arizona argued. The other defendants also filed a joint demurrer in which Arizona joined. They raised arguments that the action was barred by the statute of limitations, failed to state a claim, and the parties lacked privity.

The trial court largely overruled the governmental entities' joint demurrer,[13] finding, as to the statute of limitations, that the IOU's had properly pled equitable tolling and that factual issues had been raised which could not be resolved on demurrer.[14] The trial court, however, sustained Arizona's demurrer without leave to amend for failure to exhaust administrative remedies.[15] The amended judgment of dismissal was entered on April 22, 2008. This appeal followed.[16]

---

[12] The other defendants, who are not a party to this appeal, are governmental entities: City of Anaheim, City of Azusa, City of Banning, City of Burbank, City of Glendale, City of Los Angeles, City of Pasadena, City of Riverside, City of Santa Clara, City of Seattle, City of Vernon, Los Angeles Department of Water and Power, Modesto Irrigation District, Northern California Power Agency, Public Utility District No. 2 of Grant County, Sacramento Municipal Utility District, and Turlock Irrigation District. They and Arizona are collectively referred to in the complaint as the "Governmental Entities."

[13] The court sustained only the demurrer to the third cause of action for unjust enrichment without leave to amend, except as to Pacific Gas and Electric.

[14] The court also found that "[t]he breach of contract cause of action is proper under *Bonneville* . . . , and under the contracts themselves which state that they are subject of FERC's authority."

[15] The trial court added that "[t]his ruling is without prejudice." Arizona appealed the court's order insofar as it was "without prejudice." We dismissed the appeal on April 13, 2009, finding that an appealable issue was not presented.

[16] While this matter was pending on appeal, FERC issued an order finding that Arizona is entitled to the *Dairyland* exemption and granted Arizona's request to be designated a nonpublic utility. (*San Diego Gas & Electric Co. v. Sellers of Energy* (Dec. 18, 2008) 125 F.E.R.C. ¶ 61,297, p. 62,395.)

## DISCUSSION

### I. *Standard of review.*

A demurrer tests the sufficiency of the allegations in a complaint as a matter of law. (*Pacifica Homeowners' Assn. v. Wesley Palms Retirement Community* (1986) 178 Cal.App.3d 1147, 1151 [224 Cal.Rptr. 380].) We review the sufficiency of the challenged complaint de novo. (*Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524, 529 [260 Cal.Rptr. 713].) We accept as true the properly pleaded allegations of fact in the complaint, but not the contentions, deductions or conclusions of fact or law. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) We also accept as true facts which may be inferred from those expressly alleged. (*Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403 [44 Cal.Rptr.2d 339].) We consider matters which may be judicially noticed, and we "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Blank,* at p. 318.) The interpretation of a written contract is a judicial function subject to an independent determination, unless interpretation turns on the credibility of extrinsic evidence. (*Coopers & Lybrand,* at p. 529.) The complaint's "allegations must be liberally construed, with a view to substantial justice between the parties." (Code Civ. Proc., § 452.) The judgment or order of dismissal entered after the demurrer is sustained must be affirmed if any of the grounds for demurrer raised by the defendant is well taken and disposes of the complaint. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) But it is error to sustain a general demurrer if the complaint states a cause of action under any possible legal theory. (*Ibid.*)

### II. *Exhaustion of administrative remedies.*

Arizona's argument that the IOU's failed to exhaust their administrative remedies is premised on this: the IOU's should have tried to revoke or to limit the *Dairyland* exemption in the FERC proceedings. As we explain, we do not agree that any failure to challenge the *Dairyland* exemption in the FERC proceedings constituted a failure to exhaust administrative remedies.

██ Where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act. (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292 [109 P.2d 942].) Exhaustion of administrative remedies is a jurisdictional prerequisite to resort to the courts. (*Id.* at p. 293; *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 70 [99 Cal.Rptr.2d 316, 5 P.3d 874].) Several rationales underlie the doctrine. Its primary purpose " 'is to afford administrative tribunals the opportunity to decide in a final way matters within their

area of expertise prior to judicial review.' [Citation.]" (*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 874 [50 Cal.Rptr.3d 636].) Exhaustion of administrative remedies also facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency. (*Ibid.*) "The principal purposes of exhaustion requirements include avoidance of premature interruption of administrative processes, allowing an agency to develop the necessary factual background of the case, letting the agency apply its expertise and exercise its statutory discretion, and administrative efficiency and judicial economy. [Citation.] The exhaustion doctrine is grounded on concerns favoring administrative autonomy (i.e., courts should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless absolutely necessary). [Citation.]" (*California Water Impact Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464, 1489–1490 [75 Cal.Rptr.3d 393].)

█ We do not see how the way in which the IOU's pursued Arizona before FERC undermined the exhaustion of administrative remedies doctrine. Arizona does not dispute that FERC's " 'power includes the exclusive authority to determine the reasonableness of wholesale rates.' " (*Wholesale Electricity Antitrust Cases I & II* (2007) 147 Cal.App.4th 1293, 1312 [55 Cal.Rptr.3d 253].) Arizona thus agrees that the IOU's had to first file a proceeding before FERC, which is exactly what the IOU's did.[17] The IOU's were initially *successful* in obtaining refunds from Arizona in that proceeding, although they suffered a reversal in *Bonneville*. After *Bonneville*, it then was clear that the IOU's could not seek a remedy against Arizona from FERC. The IOU's therefore pursued a judicial remedy by filing this state court action. On these facts, the IOU's exhausted any administrative process they might have been required to pursue: they sought a remedy from the agency having jurisdiction over rates and only sought judicial review after the Ninth Circuit ruled that the remedy was not available from the agency.

█ Arizona, however, contends that the doctrine of exhaustion of administrative remedies required something more of the IOU's: the IOU's should have asked FERC to revoke or to limit the *Dairyland* exemption. This

---

[17] The IOU's argue that had they filed suit in court rather than FERC, any such action would have been dismissed under the filed rate doctrine. " ' "At its most basic, the filed rate doctrine provides that state law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question." [Citations.] "[T]he filed rate doctrine has prohibited not just a state court (or a federal court applying state law) from setting a rate different from that chosen by FERC, but also from assuming a hypothetical rate different from that actually set by FERC." ' ([*Public Util., Grays Harbor, WA v. IDACORP* (9th Cir. 2004)] 379 F.3d 641, 650–651.)" (*Wholesale Electricity Antitrust Cases I & II, supra*, 147 Cal.App.4th at p. 1316.) We express no opinion on what would have happened had the IOU's sued Arizona in state court before *Bonneville*.

contention, it seems to us, relies on a corollary principle to the doctrine that administrative remedies must be exhausted. That principle is: a litigant must fully present its arguments and evidence at the administrative hearing. " 'Before seeking judicial review a party must show that he has made a full presentation to the administrative agency upon all issues of the case and at all prescribed stages of the administrative proceedings.' " (*Edgren v. Regents of University of California* (1984) 158 Cal.App.3d 515, 520 [205 Cal.Rptr. 6].) "The requirement that a litigant present his or her arguments and evidence fully at the administrative hearing level is analogous to ·the doctrine of exhaustion of administrative remedies, though it is based on different policies." (1 Cal. Administrative Mandamus: Laying the Foundation at the Administrative Hearing (Cont.Ed.Bar 3d ed. 2003) § 3.49, p. 82 (Administrative Mandamus).)

The IOU's did not fail to satisfy any presentation requirement concerning Arizona's jurisdictional status in the FERC proceedings. To recap, a "public entity" was, in simplified terms, a private seller of energy. "Public entities" were subject to FERC's jurisdiction. A "nonpublic entity" (e.g., a government entity) was not subject to FERC's jurisdiction. Arizona, a rural cooperative subject to a RUS-financed mortgage, was traditionally afforded "nonpublic entity" status, and thus was outside of FERC's jurisdiction. That exempt status was first recognized in *Dairyland, supra,* 37 F.P.C. at page 26, where the commission noted that "the record over [the past 30 years] discloses not a single instance where Commission jurisdiction over cooperatives was asserted. All the indications are to the contrary. We therefore conclude that such jurisdiction does not presently exist." A year after *Dairyland,* a federal district court suggested that the status afforded cooperatives by *Dairyland* might one day change: "If the Commission had found that conditions in the power industry had so changed that generating cooperatives now did fall within its jurisdiction, this court would be faced with a different issue. For just as the Commission's determination here that it is without jurisdiction is entitled to judicial deference, . . . so would be its determination that it had the requisite authority." (*Salt River Project Agricultural Dist. v. Federal Power Com.* (D.C. Cir. 1968) 129 U.S. App.D.C. 117 [391 F.2d 470, 474, fn. 8], citation omitted (*Salt River*).) *Salt River* thus suggested that perhaps FERC could one day exercise jurisdiction over a cooperative if changes in the industry occurred such that rural cooperatives should be considered "public entities." There was, however, no need for the IOU's to challenge the continuing viability of *Dairyland*. FERC found that it could order refunds from Arizona under a theory having nothing to do with Arizona's traditional nonpublic entity status. The IOU's thus won in front of FERC without having to raise the jurisdictional issue.[18]

---

[18] If the IOU's did have a duty to challenge *Dairyland* expressly in the FERC proceedings, then their failure to do so would have merely constituted a waiver of the argument. (See generally, Administrative Mandamus, *supra,* §§ 3.50–3.73, pp. 82–96 [the failure to raise some

Even if we agreed that the IOU's had a duty to argue in the FERC proceedings that the *Dairyland* exemption should be found inapplicable to Arizona, that duty was satisfied. Arizona's jurisdictional or nonjurisdictional status was before FERC. On June 19, 2001, FERC issued an order prescribing mitigation directives against all sellers of electricity. (*San Diego Gas & Electric Co., supra*, 95 F.E.R.C. ¶ 61,418, p. 62,558.) On July 19, 2001, Arizona sought clarification and/or rehearing: "AEPCO seeks clarification that the Commission did not intend in its June 19 Decision *to subject non-jurisdictional sellers located outside of California such as AEPCO to any possible refund proceedings or refunds for any sales prior to June 19.*" (Original underscoring, italics added.) In apparent reference to *Dairyland*, Arizona noted that it was, "under established precedent, not subject to the Commission's public utility jurisdiction."

FERC responded with its controversial July 25, 2001 order to Arizona to pay refunds. That order can only be viewed as FERC's attempt to get around *Dairyland* by characterizing its "jurisdiction" over nonpublic utilities like Arizona as deriving from its broad authority over rates. Arizona then filed a request for rehearing of the July 25 order. Citing *Dairyland*, Arizona argued that it was not subject to FERC's public utility jurisdiction; accordingly, the commission was "without authority to determine if [Arizona's] rates [were] not 'just and reasonable' or to order a refund based on such a determination."[19] Thereafter, Arizona again asked FERC to clarify whether its treatment of " 'governmental entities' " extended to Arizona for the purposes of an order FERC had issued on December 19, 2001. These events show that Arizona's jurisdictional status was at issue in the FERC proceedings. But rather than address *Dairyland* head on, FERC tried to get around it by deriving its jurisdiction over Arizona from its general authority over rates and from Arizona's participation in the regulated markets.

In any event, a failure on the part of the IOU's to challenge *Dairyland* head on in the FERC proceedings might have been excusable. " '[T]he doctrine of exhaustion of administrative remedies has not hardened into inflexible dogma. [Citation.] It contains its own exceptions . . . .' " (*In re Hudson* (2006) 143 Cal.App.4th 1, 7 [49 Cal.Rptr.3d 74].) Those exceptions

---

defenses, objections, or challenges at the time of the administrative hearing may constitute a waiver].) If, for example, the IOU's tried to argue in these state court proceedings that the *Dairyland* exemption no longer applied to Arizona, then they might have waived or forfeited any such argument. But the IOU's do *not* challenge Arizona's status as a nonpublic entity. They concede that Arizona is a nonpublic entity and, taking *Bonneville*'s hint, are pursuing contractual theories of liability against it.

[19] Arizona also argued that even assuming that "the Commission could reverse or limit its holding in *Dairyland* so as to exercise some authority over the rates that [Arizona] can charge for its WSCC wholesale power sales prospectively, it does not follow that the Commission may retroactively order [Arizona] to make refunds for earlier periods."

include: (1) when the administrative agency cannot provide an adequate remedy; (2) when the subject of controversy lies outside the agency's jurisdiction; and (3) where it would be futile to pursue a remedy. (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 322 [25 Cal.Rptr.3d 320, 106 P.3d 976]; *Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 620 [113 Cal.Rptr.2d 309].) The IOU's could have reasonably concluded that attacking *Dairyland* would be futile. At the time the IOU's initiated the FERC proceeding in 2000, a rural cooperative had never been treated as an entity subject to FERC's jurisdiction—or at least such an instance has not been brought to our attention by the parties. In fact, just two months before FERC issued its July 25, 2001 order, FERC affirmed, in an unrelated proceeding, that Arizona was "not subject to the Commission's jurisdiction." (*Sierra Southwest Cooperative Services, Inc.* (May 30, 2001) 95 F.E.R.C. ¶ 61,310, p. 62,057.) After *Bonneville*, FERC found that Arizona's traditional nonpublic entity status should be maintained. (*San Diego Gas & Electric Co. v. Sellers of Energy, supra*, 125 F.E.R.C. ¶ 61,297, p. 62,395.) And the FPA has now codified *Dairyland*: "No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 . . . ." (16 U.S.C. § 824(f).) It therefore was unlikely that attacking *Dairyland* would have been successful, notwithstanding *Bonneville*'s suggestion that FERC perhaps could have revisited the status traditionally afforded Arizona, had it done so not in a "post-hoc" fashion.

Instead, the manner in which the IOU's proceeded—filing a proceeding before FERC in the first instance—arguably furthered the purposes of the doctrine of exhaustion of administrative remedies. It allowed FERC, which was uniquely situated and had expertise over the subject matter, to develop the record. It allowed FERC to promptly address problems in the market and to establish a methodology by which to reconfigure the rates. It also led to congressional confirmation that rural cooperatives, like Arizona, were not subject to FERC's jurisdiction. Rather than inhibiting the purposes of the exhaustion doctrine, they were promoted. The demurrer therefore should not have been sustained on the ground that the IOU's failed to exhaust their administrative remedies.

III. *Alternative grounds for sustaining demurrer.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1490.

## DISPOSITION

Pacific Gas and Electric Company's, Southern California Edison Company's, and San Diego Gas & Electric Company's supplemental request for judicial notice in support of reply brief, filed April 23, 2009, is granted.

Arizona Electric Power Cooperative, Inc.'s request for judicial notice, filed January 16, 2009, is granted.

The judgment is reversed. Plaintiffs and appellants Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company are to recover any costs on appeal.

Croskey, Acting P. J., and Kitching, J., concurred.

A petition for a rehearing was denied June 17, 2010, and the petition of appellant Arizona Electric Power Cooperative, Inc., for review by the Supreme Court was denied September 15, 2010, S184234. Chin, J., and Corrigan, J., did not participate therein.