Filed 6/4/21  The Claremont Colleges v. So. Cal. School of Theology CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE CLAREMONT COLLEGES, INC., | B301897<br>B304065 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19PSCV00419) |
| v. | |
| SOUTHERN CALIFORNIA SCHOOL OF THEOLOGY, et al., | |
| Defendants and Respondents. | |

APPEAL from an order and a judgment of the Superior Court of Los Angeles County, Gloria White-Brown, Judge. Affirmed in part; reversed in part.

Loeb & Loeb, Paul Rohrer, W. Allan Edmiston; Greines, Martin, Stein & Richland, Robin Meadow and David E. Hackett for Plaintiff and Appellant.

Jackson Tidus, Charles M. Clark and Kathryn M. Casey for Defendant and Respondent Southern California School of Theology.

Law Offices of Anthony C. Duffy and Anthony C. Duffy for Defendant and Respondent Yalong Investment Group, LLC.

_____

## SUMMARY

This case grew out of a property dispute between Southern California School of Theology (SCST)[1] and The Claremont Colleges, Inc. (Claremont).[2]  The dispute centered on the 1957

_____

[1] "SCST does business as the Claremont School of Theology. SCST is not one of the Claremont Colleges, but is an 'affiliate' of the Claremont Colleges.  According to the Claremont University Consortium's policy and procedure manual, affiliate 'status . . . has recognized a special collaborative educational relationship between the affiliate and at least one of the member Claremont Colleges . . . [and a] mutual benefit to both the affiliate and members of The Claremont Colleges.' " (*Southern California School of Theology v. Claremont Graduate University* (2021) 60 Cal.App.5th 1, 3, fn. 2 (*Claremont I*).)

[2] The named parties we referred to as Claremont in *Claremont I* were the Claremont University Consortium (CUC) and Claremont Graduate University (CGU).  CGU was established in 1925 as Claremont College.  For most of the Claremont Colleges' history, CGU oversaw centralized planning, services, and programs for all seven of the colleges—CGU, Pomona College, Scripps College, Claremont McKenna College, Harvey Mudd College, Pitzer College, and Keck Graduate Institute.  In 2000, CUC was formed as a separate entity and took over the centralized functions from CGU for the seven Claremont Colleges.  When CUC took those functions over from CGU, CGU assigned to CUC all of the colleges' real property

deed transferring the land on which SCST's campus sits from Claremont College (now CGU, which is CUC's and therefore Claremont's predecessor-in-interest) to SCST.  The deed contained two conditions subsequent, which we recite in full below.  One of the restrictions dealt with permissible uses of the property; we've referred to this deed restriction as the Educational Use Clause.  (*Claremont I*, *supra*, 60 Cal.App.5th at p. 4.)  The other dealt with conditions that would require SCST to offer the property for sale to Claremont on terms defined in the deed restriction and in an agreement that the parties executed concurrently with the deed (the 1957 Agreement); we have referred to this deed restriction as the First Offer Clause.  (*Ibid.*)

In the trial court litigation underlying *Claremont I*, the trial court entered judgment enforcing the Educational Use and First Offer Clauses as equitable servitudes under the Marketable Record Title Act (MRTA) (Civ. Code, § 880.020 et seq.).  The trial court's judgment in that matter enforced the Educational Use Clause as written.  But the trial court concluded that interpreting the First Offer Clause as written would constitute a forfeiture to SCST, and instead "chose 'to interpret the [First Offer Clause] as a "First Right of Refusal," ' and then created the terms of the First Right of Refusal by injunction." (*Claremont I*, *supra*, 60 Cal.App.5th at p. 4.)  The net effect of the trial court's judgment was to free SCST to sell the property at market value subject only to the Educational Use Clause and a requirement that it allow Claremont to match any offer it received for sale of the property

_____

assets not associated with the operation of CGU.  CUC changed its name to The Claremont Colleges, Inc. effective January 1, 2018—during the pendency of the litigation underlying *Claremont I*.

3

rather than being required to offer the property to Claremont according to the terms of the First Offer Clause. The trial court concluded that the difference between the two property value calculations was "as much as $36 million." (*Id.* at p. 6.)

The trial court entered judgment in that matter on January 23, 2019. (*Claremont I*, *supra*, 60 Cal.App.5th at p. 7.)

On February 5, 2019, SCST entered into a lease agreement with Yalong Investment Group, LLC (Yalong) that purports to lease its entire campus to Yalong for 21 years beginning on July 1, 2020. The lease agreement contains what it terms a "Purchase Obligation"—an agreement that Yalong would, "in the event that SCST obtains a final, non-appealable judicial determination . . . in [*Claremont I*] that the [property is] not restricted by a right of first offer and that [SCST] may offer to sell the [property] but subject to a right of first refusal, [Yalong] shall enter into [an attached purchase agreement] providing for the purchase of the [property] from [SCST] . . . ."

Claremont filed suit against SCST and Yalong based on allegations that the lease agreement between SCST and Yalong violated the Educational Use Clause and whichever of the First Offer Clause or the trial-court-created First Right of Refusal eventually survived to final judgment. We consolidated appeals from an order denying Claremont's request for a preliminary injunction against SCST and Yalong that would essentially prohibit the lease agreement from going into effect (case No. B301897) and from a judgment entered after the trial court sustained SCST's demurrers to Claremont's verified first amended complaint (FAC) without leave to amend (case No. B304065).

4

As we explore more fully below, the resolution of both of these appeals turns on the trial court's interpretation of the word "transfer" as that term is used in the First Offer Clause. Because we disagree with the way the trial court interpreted that term, we will reverse.

## BACKGROUND
### A. SCST's History with Claremont

"SCST withdrew from the University of Southern California in 1956. In 1957, it affiliated with the Claremont Colleges and purchased the land it now sits on (adjacent on two sides to [CGU] and near the remaining Claremont Colleges) for approximately $107,500.

"As part of the transaction transferring land and affiliating SCST and the Claremont Colleges, SCST and Claremont executed, among other documents, a grant deed and a written agreement (the 1957 Agreement).[3] The deed contained two conditions subsequent: '1. That no industrial or commercial activity, or any activity or condition contrary to any law or ordinance, or any activity or condition not usual and appropriate for an educational institution of collegiate grade, shall be conducted or suffered to be conducted or to exist on the real property granted'—the Educational Use Clause; and '2. That if

---

[3] "In 2001, the parties entered into an agreement to 'amend and reaffirm' the 1957 Agreement. The 2001 agreement specifically referenced the First Offer and Educational Use Clauses and restated terms of the 1957 Agreement. In 2006, Claremont and SCST were both parties (among several other entities) to an agreement that acknowledged the 1957 Agreement and that it had been 'amended and reaffirmed' by the 2001 agreement.

[SCST] . . . desire[s] to sell or transfer the said real property or any portion thereof, or if [SCST] does not within three years from the date of this Deed establish upon the said real property its headquarters and reasonably develop the said real property as its principal establishment and headquarters, or if [SCST] should cease to exist, or if [SCST] should cease to use the said real property as its principal place of carrying on its activities, then the said real property shall be offered for sale to [Claremont] upon the terms and conditions provided in [the 1957 Agreement] made by [Claremont] and [SCST] upon the same date as the date of this deed'—the First Offer Clause. The deed made the conditions subsequent enforceable by a power of termination and right of reentry clause . . . .

"The 1957 Agreement incorporated 'the terms and conditions of the said Deed' and set forth in detail the 'terms and conditions' of the First Offer Clause and, among other provisions, a number of obligations by each party giving contour to the Educational Use Clause.

"In 2015, SCST approached [Claremont] to determine whether it or any of the Claremont Colleges had an interest in purchasing or leasing any part of the SCST campus or otherwise helping SCST to financially leverage the property through 'partnership opportunities for new development' or by '[c]o-locating services or functions.' [Claremont] and SCST negotiated, but never reached any agreement regarding SCST's campus property. *SCST marketed the property for sale, and ultimately received offers*." (*Claremont I, supra*, 60 Cal.App.5th at pp. 4-5, fns. omitted, italics added.)

6

## B. SCST's Lawsuit – *Claremont I*

"SCST filed suit against Claremont in August 2016 asking the trial court to quiet title against Claremont and to declare that the Educational Use Clause and First Offer Clause had expired pursuant to the MRTA. Claremont cross-complained, alleging that SCST had breached the deed, the 1957 Agreements, and other agreements by marketing the property without first offering it for sale to Claremont on the terms of the First Offer Clause and seeking specific performance of the First Offer Clause and a declaration that the terms of the parties' agreements remain valid in spite of the MRTA.

"The matter was tried to the court in September 2018, and on December 18, 2018, the trial court issued a lengthy written statement of decision. The trial court concluded that the Educational Use and First Offer Clauses had expired by operation of the MRTA on January 1, 1988. The provisions in the parties' various agreements were [also] not enforceable under a breach of contract theory . . . .

"The trial court noted, however, that under the MRTA, 'an expired power of termination may still be enforced by injunctive relief where it also constitutes an equitable servitude.' The trial court concluded that the Educational Use Clause and First Offer Clause 'constitute equitable servitudes enforceable by injunction.' Nevertheless, the trial court concluded that 'strict enforcement of the [First Offer Clause], and its method of calculating the price to repurchase the property, would result in [SCST] suffering a forfeiture of as much as $36 million, being the difference between the purchase price calculation under the 1957 Agreement and the current fair market value of the property.' Based on its conclusion that enforcement of the First Offer Clause would

7

result in a forfeiture by SCST, the trial court 'therefore [chose] to interpret the [First Offer Clause] as a "First Right of Refusal." ' The trial court then set forth extensive and detailed terms by which Claremont could exercise the first right of refusal the trial court created.

"The trial court entered judgment on January 23, 2019, setting forth in judgment form the same findings and conclusions. Claremont filed a timely notice of appeal." (*Claremont I*, *supra*, 60 Cal.App.5th at pp. 5-7, fns. omitted.)

### C. The Lease Agreement

SCST and Yalong negotiated and, on February 5, 2019, entered into a 65-page lease agreement purporting to lease SCST's entire campus to Yalong for 21 years beginning on July 1, 2020 (what the lease terms the "Rent Commencement Date" or the beginning of the "Basic Term").[4]

From the date of the execution of the lease agreement (or the "Lease Commencement Date") until the Rent Commencement Date—termed the agreement's "Initial Period"—SCST gave Yalong "access to the entire Premises" and agreed to reimburse Yalong for insurance premiums Yalong paid to insure the property during the Initial Period. SCST reserved for itself the right to occupy the property rent free during the Initial Period, and agreed to "withdraw from the [property] and surrender

---

[4] Claremont's FAC alleges that "[a]fter the trial of [*Claremont I*], on December 26, 2018, [SCST] secretly entered into a sale agreement with a real estate investment and development company called Yalong." Although the record reveals obvious ambiguities regarding execution of the lease agreement between December 2018 and February 5, 2019, we defer to the date that the parties handwrote onto the lease agreement's cover—February 5, 2019.

possession thereof to [Yalong] upon the Rent Commencement Date." "During the Basic Term," SCST and Yalong agreed that Yalong "shall lawfully, peacefully and quietly hold, occupy and enjoy the [property] without disturbance, interruption or hindrance by [SCST], or any Person claiming by or through [SCST.]"

Yalong also agreed that it would pay SCST three deposits totaling $10 million to be applied either to purchasing the property or to rent due under the lease. The first two deposits were due on the lease's "Effective Date"—a date to be calculated based on the outcome of the *Claremont I* litigation.[5] The third was due within 30 days of the Effective Date. The lease contains a "Purchase Obligation" provision, described more fully below. If the purchase happened, the deposits would be applied to the property's purchase price ($35 million). If the purchase did *not* happen, the deposits would be applied as follows: the first deposit ($5.8 million) would be applied to monthly rent due from March 1, 2034 to December 1, 2038; the second deposit ($1.2 million) would be applied to monthly rent due in 2039; the third deposit ($3 million) would be applied to rent due in the 30 months following the Rent Commencement Date.

The lease's Article 19 is entitled "Obligation to Purchase." "[I]n the event that [SCST] obtains a final, non-appealable judicial determination . . . in [*Claremont I*] that the [property is] not restricted by a right of first offer and that [SCST] may offer to sell the [property] but subject to a right of first refusal, [Yalong]

---

[5] Although it is unclear from the record whether any party believes the lease's Effective Date has been triggered, Yalong had paid the three deposits to SCST by—at the latest—September 23, 2019.

9

shall enter into the Purchase Agreement [attached as an exhibit to the lease] providing for the purchase of" SCST's campus from SCST. The Purchase Agreement was to be executed within 10 business days after SCST notified Yalong of a final judgment in the *Claremont I* matter and escrow opened to administer the transaction.[6] If SCST could not deliver good title, Yalong would retain an option to purchase the property on "substantially similar" terms for the entire term of the lease.

Among other attachments, the lease agreement attached a "Memorandum of Lease" that was to be recorded (an executed copy *was* recorded on February 6, 2019), the referenced Purchase Agreement, a grant deed, and a leaseback agreement (leasing the property from Yalong to SCST) that would have terminated on June 30, 2020.

### D. Claremont's Lawsuit

In early March 2019, Claremont learned of the lease and what it believed was an " 'option' to purchase," but did not know Yalong's identity or the terms of the lease. Claremont requested

_____

[6] A written amendment to the lease dated February 4, 2019—also attached to the FAC—appears to have set what the parties call an "Outside Date" to execute the Purchase Agreement. The amendment recognized, however, that the judgment in *Claremont I* might not be final before the Outside Date—December 31, 2020, and left intact the 10-business-day requirement in the lease agreement for execution and opening of escrow after notification of a final, non-appealable judgment in *Claremont I.* The amendment also provided for extension of the Outside Date in the event Claremont "challenge[d] [Yalong's] status as a qualified buyer" under the Educational Use Clause, but stated that "in no event shall the Outside Date be extended beyond December 31, 2022" without the parties' further written agreement.

10

a copy of the lease agreement and related documents from SCST, but SCST declined to provide them. Claremont filed a post-judgment motion for preliminary injunction in the *Claremont I* action seeking to obtain a copy of the lease agreement. In its opposition to the motion for preliminary injunction filed April 22, 2019, SCST gave Claremont a copy of the recorded Memorandum of Lease, which identified the parties to the lease agreement.

On May 3, 2019, Claremont filed a verified complaint against both SCST and Yalong essentially alleging in 11 causes of action that the lease agreement violated the First Offer and Educational Use Clauses and seeking to prevent the lease from having any practical effect until after the *Claremont I* judgment was final; Claremont withdrew its motion for preliminary injunction in the *Claremont I* case.[7] On June 6, 2019, SCST filed general and special demurrers and a motion to strike portions of the original complaint.

SCST included a copy of the lease in a request for judicial notice it filed in support of its demurrers and motion to strike.

On June 26, 2019, Claremont filed the verified FAC—the operative pleading for purposes of this appeal—and attached, among other documents, the 1957 deed, the 1957 Agreement, the 2001 agreement, and the lease. The FAC alleges 10 causes of action (listed below) alleging, at base, that the lease agreement violates the Educational Use Clause and either the First Offer

_____

[7] The original complaint also alleged causes of action related to a repurchase option in a 1972 deed related to property Claremont had gifted to SCST. Those allegations do not appear in the FAC. Because this appeal is about allegations contained only in the FAC, we have omitted substantial discussion of the original complaint.

Clause or the right of first refusal the trial court created in its judgment in *Claremont I*. "Whatever the outcome on appeal," Claremont alleged, SCST "will be prohibited from 'selling or transferring' [its campus] to a third party without first providing [Claremont] with the opportunity to purchase or acquire the [property] (either in accordance with the [First Offer Clause] if the [*Claremont I* judgment] is reversed, or in accordance with the First Right of Refusal if the [j]udgment is affirmed)."

The First Offer Clause is set forth above in section A (in connection with the 1957 deed and 1957 Agreement). The 2001 agreement contained the following terms: "[Claremont] has heretofore conveyed to [SCST] and [SCST] accepted, certain real property located in Claremont, California, by a Grant Deed, dated June 5, 1957, and [SCST] agreed to the terms and conditions of the said Deed. [¶] The terms and conditions of the offer of sale required of [SCST] by the said Deed were and continue to be . . . ." The 2001 agreement then recited in full the terms and conditions contained in the 1957 Agreement.

The FAC characterizes the lease agreement as a "Sale Agreement" and alleges that it "confirms that [SCST] entered into a binding agreement, dated as of February 5, 2019, to sell the [property] to Yalong upon the occurrence of a contingency." Claremont alleged that SCST had triggered the First Offer Clause because it had "formed a 'desire to sell or transfer' " the property and because it either had ceased to use the property " 'as its principal place of carrying on its activities' " or would do so in the near future. Claremont also alleged that Yalong was a "for-profit real estate and development company" and was not "a bona fide educational institution of collegiate grade," so the lease would also violate the Educational Use Clause.

12

Consistent with those allegations, the FAC alleges causes of action against SCST for: breach of the 1957 agreement (first cause of action); breach of the 1957 deed (second cause of action); breach of the 2001 agreement (third cause of action); specific performance of the First Offer Clause (sixth cause of action); specific performance of the first right of refusal under the judgment in *Claremont I* (seventh cause of action). It alleges causes of action against Yalong for: intentional interference with the First Offer Clause (fourth cause of action); quiet title based on the First Offer Clause (fifth cause of action); intentional interference with the first right of refusal under the judgment in *Claremont I* (eighth cause of action). The FAC alleges causes of action against both SCST and Yalong for declaratory (ninth cause of action) and injunctive (tenth cause of action) relief.

SCST moved to strike portions of the FAC and again generally and specially demurred.[8]

While SCST's demurrers were pending, Claremont moved the trial court for a preliminary injunction requesting relief pending the outcome of both the appeal in *Claremont I* and trial in this matter. Claremont asked the trial court to enter an order

---

[8] Yalong also demurred to the FAC. The notices of appeal in these consolidated matters do not implicate the trial court's orders on Yalong's demurrers. The matter is still pending in the trial court as to Yalong. We discuss Yalong's demurrers to the extent necessary for a full understanding of the issues presented by these appeals. The trial court ruled on Yalong's demurrers, but granted Claremont leave to amend as to Yalong. The appellant's appendix contains an order sustaining Yalong's demurrers to a second amended complaint, deferring a ruling on Claremont's request for leave to amend, and staying the matter pending finality of the appeal in *Claremont I*.

prohibiting SCST from transferring any interest in SCST's campus to Yalong (and Yalong from acquiring any interest in SCST's campus), requiring SCST and Yalong to "cancel and annul their agreement to sell and/or lease" the campus or prohibit SCST and Yalong from taking further steps to implement the lease or sale, to prohibit Yalong from "occupying, using, or remaining in possession" of SCST's campus, prohibiting SCST and Yalong from subdividing or altering the campus in any way, prohibiting Yalong from entering into any agreements with any third parties related to the property, and requiring SCST to hold any funds it received from Yalong under the agreement in constructive trust and prohibiting SCST from concealing or dissipating those funds.

## 1. Claremont's Motion for Preliminary Injunction

Before hearing the matter on October 15, 2019, the trial court issued a tentative ruling denying Claremont's motion. Regarding Claremont's likelihood of success on the merits of the litigation, the trial court stated: "Here, the [l]ease does not violate the [trial-court-created first right of refusal] or the terminated [First Offer Clause]. The scope of the [first right of refusal] is 'purchase or acquire' the property and the scope of the terminated [First Offer Clause] is 'sell or transfer' the property. The [trial] court in [*Claremont I*] declined to include [Claremont's] proposed 'lease' language into the [first right of refusal] procedure set forth in its Final Statement of Decision. A 'transfer,' moreover, is defined as 'an act of the parties, or of the law, by which the title to property is conveyed from one living person to another.' (Civ[.] Code[,] § 1039.) Further, there has been no sale, and any potential future option is contingent upon compliance with any possible restriction on the Property. [¶]

14

The [l]ease likewise does not violate the Educational Use [Clause].  Under the [l]ease, Yalong's use of the Property does not commence until July 1, 2020.  When its use starts, Yalong is required to use the Property in conformance with the Educational Use [Clause].  [¶]  [Claremont], then, has not demonstrated a reasonable likelihood of prevailing on the merits at the time of trial."

The trial court also concluded that Claremont had not demonstrated that it would suffer any interim harm absent the requested relief.  The trial court concluded that "[t]he terms of the [lease] . . . reflect that no restrictions will be violated. [Yalong's] use, moreover, does not commence until July 1, 2020. [Claremont's] argument that '[t]here is also a substantial risk that the Property will be irreparably harmed' . . . is speculative and not supported by any evidence.  [¶]  On the other hand, [SCST] has shown that it would sustain great injury if the court were to grant the preliminary injunction.  [SCST's] President . . . states that in 2016, [SCST] was in financial peril as it had difficulty making payments to its lenders, which was causing accreditation issues. . . .  [SCST] decided to search for a tenant who could lease the premises to generate revenue to resolve these financial issues and had discussions with potential lessee about larger upfront rental deposit payments. . . .  Under the terms of the [l]ease with Yalong, Yalong has paid approximately $10 [million] in deposits to [SCST]. . . .  [SCST] has survived because of the [l]ease and was able to use the deposits for loan payments and to keep its . . . accreditation. . . .  If the [l]ease were invalidated and [SCST] was somehow forced to claw back the approximately $10 [million] [SCST] used to pay off its lenders, [SCST] would not be financially sustainable."

The trial court issued a minute order on October 17, 2019 denying Claremont's motion for preliminary injunction. On October 22, 2019, Claremont filed a notice of appeal from the October 17 minute order. On October 23, 2019, the trial court issued a written order denying Claremont's motion for preliminary injunction and attached its tentative ruling. Claremont filed a notice of appeal from the trial court's second order on October 25, 2019. Those notices of appeal initiated number B301897.

## 2. SCST's Demurrers

The trial court heard SCST's demurrers to and motion to strike portions of the FAC on December 5, 2019.[9] Before the hearing, the trial court issued a tentative ruling sustaining SCST's demurrers without leave to amend and denying its motion to strike as moot.

The trial court concluded that Claremont's causes of action against SCST "fail on the basis that the lease agreement does not violate the [first right of refusal the trial court created in *Claremont I*], the [First Offer Clause] and/or the Educational Use [Clause]."

The court listed the elements of causes of action for breach of contract, specific performance, declaratory relief, and injunctive relief. It then stated that "[e]ach cause of action, then,

---

[9] As noted above at footnote 3, Yalong also demurred to the FAC. Its demurrers were heard at the same hearing as SCST's demurrers and motion to strike. But no judgment has been entered on Claremont's claims against Yalong, and the trial court's rulings on Yalong's demurrers are not yet appealable. (See *Lopez v. Brown* (2013) 217 Cal.App.4th 1114, 1132.)

16

alleges, at least in part, that the restrictions were violated by [SCST] leasing the subject property to Yalong."

The trial court concluded that: "Here, the lease agreement does not violate the [first right of refusal] or the terminated [First Offer Clause]. The scope of the [first right of refusal] is 'purchase or acquire' the property and the scope of the terminated [First Offer Clause] is 'sell or transfer' the property. A 'transfer,' moreover, is defined as 'an act of the parties, or of the law, by which the title to property is conveyed from one living person to another.' (Civ[.] Code[,] § 1039 ["There is no "transfer" of title by a lease within the meaning of this section"]; see also *San Pedro, L.A. & S.L.R. Co. v. Hamilton* (1911) 161 Cal. 610.) The terms of the lease agreement reflect that Yalong received a possessory interest, for a fixed period of time, will pay rent for that interest, and will surrender possession of the subject property upon expiration of the term. The rent payment structure in the lease agreement does not somehow turn the lease agreement into a sale, as § 3.2 therein provides that the $10 [million] is a rent payment and will go to the rental obligation for the duration of the lease agreement. Said provision also provides that the funds are not refunded if Yalong is unable to purchase the subject property. [¶] The lease agreement likewise does not violate the Educational Use [Clause]. Under the lease agreement, Yalong's use of the subject property does not commence until July 1, 2020. [Claremont] makes much of the fact that Yalong admitted in discovery that its listed place of business is the subject property. . . ; this admission, however, does not contradict the commencement date in the lease agreement, but simply confirms that Yalong is going to conduct business at the subject property. When its use starts, moreover, Yalong is required to use the

17

subject property in conformance with the Educational Use [Clause]." (Citations and parenthetical in original.)

The trial court issued a minute order on December 17, 2019 adopting its tentative ruling. It entered judgment for SCST against Claremont on January 24, 2020.

Claremont filed a timely notice of appeal, which initiated case number B304065.

Claremont filed an application in this court on June 1, 2020 asking us to consolidate its appeals from the trial court's order denying its motion for preliminary injunction and the trial court's judgment entered after the trial court sustained SCST's demurrers to the FAC without leave to amend. We granted that request.

## DISCUSSION
### A. SCST's Demurrers to the FAC
#### 1. Legal Standards
##### a. Standard of Review

"A demurrer tests the sufficiency of the allegations in a complaint as a matter of law. [Citation.] We review the sufficiency of the challenged complaint de novo. [Citation.] We accept as true the properly pleaded allegations of fact in the complaint, but not the contentions, deductions or conclusions of fact or law. [Citation.] We also accept as true facts which may be inferred from those expressly alleged. [Citation.] We consider matters which may be judicially noticed, and we 'give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.' [Citation.] The interpretation of a written contract is a judicial function subject to an independent determination, unless interpretation turns on the credibility of extrinsic evidence. [Citation.] The complaint's 'allegations must

18

be liberally construed, with a view to substantial justice between the parties.' [Citation.] The judgment or order of dismissal entered after the demurrer is sustained must be affirmed if any of the grounds for demurrer raised by the defendant is well taken and disposes of the complaint. [Citation.] But it is error to sustain a general demurrer if the complaint states a cause of action under any possible legal theory." (*In re Electric Refund Cases* (2010) 184 Cal.App.4th 1490, 1500.)

### b. Contract Interpretation

" 'The goal of contractual interpretation is to determine and give effect to the mutual intention of the parties.' [Citations.] Thus, a 'court's paramount consideration in construction [a] [contract] is the parties' objective intent when they entered into it.' [Citations.] 'That intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citation.] ' "All the rules of interpretation must be considered and each given its proper weight, where necessary, in order to arrive at the true effect of the instrument." ' [Citation.] 'Generally speaking, "the rules of interpretation of written contracts are for the purpose of ascertaining the meaning of the *words used* therein . . . ." '

"Thus, '[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' [Citation.] 'The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.' [Citation.] 'When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . .' [Citation.] 'The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the

other.' [Citation.] 'A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.' [Citation.] 'The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.' [Citation.]

"In sum, courts must give a ' "reasonable and commonsense interpretation" ' of a contract consistent with the parties' apparent intent. [Citation.] The language ' " 'in a contract must be construed in the context of that instrument as a whole.' " ' [Citation.] Further, if possible, the court should give effect to every provision of the contract." (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 525-526 (*R.J. Reynolds*).)

### 2. Analysis

Claremont's causes of action at issue on appeal from the trial court's judgment sustaining SCST's demurrers are: breach of the 1957 Agreement (based on the First Offer and Educational Use Clauses), breach of the 1957 deed (on the same bases), breach of the 2001 agreement (on the same bases), specific performance of the First Offer Clause, specific performance of the first right of refusal the trial court created in its judgment in *Claremont I*, declaratory relief associated with the trial court's judgment in *Claremont I* and interpretation of the parties' contracts, and injunctive relief related to the same.

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or

20

excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) "The availability of the remedy of specific performance is premised upon . . . . [a] showing by plaintiff of (1) the inadequacy of his legal remedy; (2) an underlying contract that is both reasonable and supported by adequate consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract." (*Tamarind Lithography Workshop, Inc. v. Sanders* (1983) 143 Cal.App.3d 571, 575.) A cause of action for declaratory relief "is sufficient if it sets forth facts showing the existence of an actual controversy relating to the legal rights and duties of the respective parties under a contract and requests that the rights and duties be adjudged." (*Bennett v. Hibernia Bank* (1956) 47 Cal.2d 540, 549-550; Civ. Code, § 1060.)

The trial court concluded that each of the causes of action failed because it concluded that SCST's agreement to lease its campus to Yalong "does not violate the [first right of refusal], the [First Offer Clause,] and/or the Educational Use [Clause]." We need not determine whether the FAC alleged a violation of *each* of the three clauses; allegations constituting a cause of action under any theory will defeat demurrers. (*In re Electric Refund Cases*, *supra*, 184 Cal.App.4th at p. 1500.)

We address the FAC's cause of action for injunctive relief separately below.

### a. Specific Performance of First Right of Refusal

The litigation between the parties has overtaken Claremont's complaint in this matter as to at least one cause of

21

action in the FAC. SCST filed its action seeking to invalidate the First Offer and Educational Use Clauses in August 2016. The trial court entered judgment in that matter in January 2019, declining to enforce the First Offer Clause and creating a first right of refusal in its stead. Claremont filed a notice of appeal in that matter on February 1, 2019.

On February 5, 2019, SCST and Yalong entered into the lease agreement. Claremont learned about the lease the following month.

After unsuccessfully seeking a copy of the lease agreement, Claremont filed this action on May 3, 2019, and ultimately filed the FAC on June 26, 2019. The trial court heard SCST's demurrers on December 5, 2019, and entered judgment on January 24, 2020 after dismissing the FAC as to SCST.

Almost a year later—on January 22, 2021—we filed our opinion in *Claremont I*. In our disposition in *Claremont I*, we directed the trial court to "vacate its judgment and enter judgment enforcing as written the First Offer Clause and Educational Use Clause as equitable servitudes under Civil Code section 885.060, subdivision (c)." (*Claremont I, supra*, 60 Cal.App.5th at pp. 10-11.)

The Supreme Court denied review in *Claremont I* on April 28, 2021. We remitted the case to the trial court on April 30, 2021. Our decision in that matter is now final. (Cal. Rules of Court, rules 8.264(b), 8.532(b)(2)(A), 8.272(b)(1)(A).)

Consistent with our decision in *Claremont I*, the first right of refusal the trial court created in its statement of decision and judgment in that matter no longer exists.

"Moot cases . . . are '[t]hose in which an actual controversy did exist but, by the passage of time or a change in

circumstances, ceased to exist.' " (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1573.) "A case is considered moot when 'the question addressed was at one time a live issue in the case,' but has been deprived of life 'because of events occurring after the judicial process was initiated.' " (*Id.* at p. 1574.) "The pivotal question in determining if a case is moot is . . . whether the court can grant the plaintiff any effectual relief." (*Ibid.*)

The FAC's seventh cause of action seeks specific performance of the first right of refusal created by the trial court judgment in *Claremont I.* The finality of our decision in *Claremont I* renders that cause of action moot. Because the first right of refusal no longer exists, Claremont would not be able to state a cause of action based on that provision in the trial court's *Claremont I* judgment. On that basis, we will affirm the trial court's order sustaining SCST's demurrer as to the seventh cause of action.

### b. Breach of Contract, Specific Performance of First Offer Clause, Declaratory Relief

The trial court's ruling on SCST's demurrers concluded that each of the FAC's causes of action failed because the lease agreement between SCST and Yalong "does not violate the [first right of refusal], the [First Offer Clause,] and/or the Educational Use [Clause]."[10] Claremont disagrees with each of those

---

[10] As explained in our discussion of the FAC's seventh cause of action—for specific performance of that first right of refusal—our opinion in *Claremont I* mooted allegations and arguments based on the first right of refusal the trial court created in its judgment in *Claremont I.* We do not address those allegations or arguments again here.

conclusions. Claremont contends that the lease evidenced SCST ceasing use of the campus and of SCST's desire to sell the property, which it alleged triggered the First Offer Clause. Claremont also contends that Yalong has offered to purchase the campus, which Claremont argues would violate the First Offer Clause. In an argument directed at the conclusion underlying the trial court's order, Claremont contends that a lease can be a "transfer" as that term is used in the First Offer Clause, and that the transfer evidenced by the lease agreement breached the First Offer Clause. Finally, Claremont contends that Yalong's use of the campus violates the Educational Use Clause in the parties' deed and agreements.

SCST primarily counters by arguing—directly contrary to the trial court's order—that the FAC is not ripe for adjudication and that the lease agreement does not violate the First Offer Clause because it makes any future purchase of the property subject to that Clause. SCST filed no notice of cross-appeal and therefore generally may not "urge error on appeal." (*California State Employees' Assn. v. State Personnel Bd.* (1986) 178 Cal.App.3d 372, 382, fn. 7; accord *Henigson v. Bank of America Nat. Trust & Savings Ass'n* (1948) 32 Cal.2d 240, 244; and *Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 665.)

In its order on SCST's demurrers, the trial court concluded that "a ripe dispute exists." We will not revisit that finding here except to note the circularity of SCST's argument. Claremont and SCST disagree whether a lease can be a "transfer" as that term is used in the First Offer Clause. If a lease *can* be a transfer, then a present breach is alleged; if *not*, then SCST contends (even in spite of Claremont's remaining arguments) that there has not yet been a breach. Even if we were to consider

24

SCST's ripeness contentions, they would be unavailing without an analysis of each of the remaining contentions.

The causes of action at issue—the first, second, third, sixth, and ninth (we address the tenth below)—each state that the lease violates the terms of both the First Offer and Educational Use Clauses, and therefore violate the terms of the 1957 deed, the 1957 Agreement, and the 2001 agreement. We note that the parties' central arguments here focus largely on whether the lease or any actions taken in advance of the lease constitute a breach of the First Offer Clause.[11] We begin our analysis there.

Claremont also argues, however, and the FAC alleges, that the First Offer Clause was triggered by SCST's "desire" to sell as evidenced by both the lease and by an Offering Memorandum through which SCST offered the campus for sale or lease in January 2018. The Offering Memorandum, attached to the FAC, states: "[SCST] intends to lease or sell all, or a large portion, of its campus in Claremont, California, thus allowing [SCST] to

---

[11] At oral argument, SCST insisted that Claremont had not argued or otherwise raised in the trial court that the SCST-Yalong lease agreement constituted a "transfer" of the property that would trigger the First Offer Clause. We disagree with SCST's assertion. Correspondence between Claremont's attorneys and SCST's attorneys dating from early 2018—shortly after SCST listed the property for sale or lease—reveals the genesis of the parties' discussions of this issue. Although the FAC largely refers to the lease agreement as a "Sale Agreement," there is no question about what agreement is at issue or what constituted its terms. And there has never been a question about whether the FAC's central allegations are that the SCST-Yalong agreement, whether it is termed a lease or a "Sale Agreement" purports to "transfer" property interests from SCST to Yalong.

potentially embed itself into the Willamette University campus in Salem, OR." We also address this contention.

### i. Is the Lease a Transfer?

The First Offer Clause provided: "That if [SCST] desire[s] to *sell or transfer* the said real property or any portion thereof, or if [SCST] does not within three years from the date of this Deed establish upon the said real property its headquarters and reasonably develop the said real property as its principal establishment and headquarters, or if [SCST] should cease to exist, or if [SCST] should cease to use the said real property as its principal place of carrying on its activities, <u>then</u> the said real property *shall be offered for sale to* [*Claremont*] upon the terms and conditions provided in [the 1957 Agreement] made by [Claremont] and [SCST] upon the same date as the date of this deed. [¶] The [First Offer Clause] shall be satisfied by the giving of an offer of sale as therein provided, and upon the rejection, or nonacceptance as therein provided, of said offer of sale by [Claremont], this said condition shall thereupon be, and be deemed, satisfied in that instance, and the real property, or portions thereof as to which said offer of sale has been rejected or not accepted may be sold by [SCST] to some other person or corporation, but subject, however, to the [Educational Use Clause]." (Italics added.)

The trial court concluded the "scope of the terminated [First Offer Clause] is 'sell or transfer' the property. A 'transfer,' moreover, is defined as 'an act of the parties, or of the law, by which the title to property is conveyed from one living person to another.' (Civ[.] Code[,] § 1039 ['There is no "transfer" of title by a lease within the meaning of this section']; see also *San Pedro,*

26

*L.A. & S.L.R. Co. v. Hamilton* (1911) 161 Cal. 610.)"  (Citations and parenthetical in original.)

The trial court's order turned on its interpretation of the term "transfer" as the parties used that term in the First Offer Clause.  As an initial observation, we note again that " '[t]he words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning . . . .' "  (*R.J. Reynolds*, *supra*, 107 Cal.App.4th at pp. 525-526.)

A leading California treatise on real property law explains that "[i]n the strict legal sense of the term, 'property' means the totality of rights that a person has in the tangible and intangible things classified in the generic sense.  In other words, land has no significance as 'property' except with reference to the rights a person can exercise in relation to it . . . ."  (3 Miller & Starr, Cal. Real Estate (4th ed. 2020) § 9:1 [in chapter 9: "Transferable Property Interests"].)  "Property rights in a physical thing include the right to acquire, use, possess, and dispose of the object or interest."  (3 Miller & Starr, Cal. Real Estate (4th ed. 2020) § 9:2.)  "The first of the rights in property is the right of acquisition."  (*Ibid.*)  "A person may acquire the 'fee,' which is the highest, most exclusive estate in real property, or a fee subject to a power of termination.  A person may acquire a lesser estate, limited in time, such as a life estate *or a leasehold.*"  (*Ibid.*, italics added, fns. omitted.)  At the very least, this implies that a property owner may transfer by lease, and a lessor may acquire, property rights.

California courts have frequently used the term "transfer" in connection with leases.  Decades ago, our Supreme Court said that "[a] lease is primarily a conveyance in that it *transfers* an estate to the lessee[.]"  (*Medico-Dental Bldg. Co. of Los Angeles v.*

27

*Horton & Converse* (1942) 21 Cal.2d 411, 418, italics added.) More recently, the court in *Vallely Investments, L.P. v. BancAmerica Commercial Corp.* (2001) 88 Cal.App.4th 816, 822, explained that "[a] lease of real property is both a conveyance of an estate in land (a leasehold) and a contract. It gives rise to two sets of rights and obligations—those arising by virtue of the *transfer* of an estate in land to the tenant (privity of estate), and those existing by virtue of the parties' express agreements in the lease (privity of contract)." (Italics added.) Each of these cases, then, supports the conclusion that a lease may "transfer" a set of property rights.

We note that the trial court relied not on an "ordinary and popular" sense of the word, but on a statutory definition of the term "transfer." Civil Code section 1039 states in its entirety: "Transfer is an act of the parties, or of the law, by which the title to property is conveyed from one living person to another."

The trial court's parenthetical to its statutory citation— " 'There is no 'transfer' of title by a lease within the meaning of this section' "—does not appear in the statute or in any case that we have been able to locate. The *attribution* of this language as a quote from the statute appears to have originated in a February 14, 2018 letter from SCST to Claremont: "See [Civ. Code, §] 1039 stating 'There is no "transfer" of title by a lease within the meaning of this section[.]" SCST continued to misquote section 1039 in its briefing to the trial court: "A lease does [not] convey title to property from one party to another, so a lease is not a transfer or assignment. (Cal. Civ. Code, §1039 ['There is no transfer' of title by a lease within the meaning of this section']; see also *San Pedro, L.A. & S.L.R. Co. v. Hamilton* (1911) 161 Cal. 610.)"

28

The trial court's order tracks SCST's misquote and appears to adopt what we explain below is an incorrect statutory interpretation.

Even if (a) the contract should have been interpreted by reference to a statutory definition of the term "transfer," and (b) SCST's interpretation of Civil Code section 1039 had not been based on misquoted statutory language, section 1039 is not the only California statutory definition of the term "transfer." The Uniform Voidable Transactions Act (Civ. Code, §§ 3439 et seq.) defines a "[t]ransfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, *and includes* payment of money, release, *lease*, license, and creation of a lien or other encumbrance." (Civ. Code, § 3439.01, subd. (m), italics added.) In the context of the interpretation of a contract, where the trial court was bound to use the language's "ordinary and popular sense" absent an expression by the parties that it have a special meaning, SCST offers no meaningful explanation for selection of one statutory definition of the term over another.

Moreover, Civil Code section 1039 does not exist in isolation. It is part of a broader statutory scheme. Civil Code section 1000 explains that a "Transfer" is one of five methods by which "[p]roperty is acquired . . . ." (Civ. Code, § 1000, subd. (3).) Moreover, "title," as that term is used in section 1039, is not limited to the fee simple estate defined in section 762.

Section 1006 explains that occupancy of property—"for any period"—is sufficient to convey limited *title*. "Occupancy *for any period* confers a title sufficient against all *except* the state *and those who have title by prescription, accession, transfer, will, or succession*; but the title conferred by occupancy is not a sufficient

29

interest in real property to enable the occupant or the occupant's privies to commence or maintain an action to quiet title, unless the occupancy has ripened into title by prescription." (Civ. Code, § 1006, italics added.) And section 1091, defining the statutory "method of transfer," establishes that something less than a fee simple estate can be "transferred": "An estate in real property, other than an estate at will or for a term not exceeding one year, can be transferred only by operation of law, or by an instrument in writing, subscribed by the party disposing of the same, or by his agent thereunto authorized by writing." (Civ. Code, § 1091.) The 21-year lease appears to meet those requirements.

We are most persuaded, however, by our Supreme Court's explanation (in a discussion of Civil Code section 1039) about the "ordinary" use of the word "transfer." The Court began with the correct statutory language of section 1039 and explored different meanings the word "transfer" might have: "In legal phraseology[, transfer] is commonly used to denote the passing of title in property, usually realty, *or an interest therein from one person to another*. [Citations.] In *Estate of Peabody*, 154 Cal. 173 . . . , it was said that while the word "transfer" as used in the Civil Code indicates the passing of title from one person to another, *in its ordinary use it has a very general meaning, including the removal of a thing from one place or person to another, the changing of its control or possession or the conveyance of title to it. It is also true that a "transfer" of property may be effected by delivery of its possession to another*." (*Commercial Discount Co. v. Cowen* (1941) 18 Cal.2d 610, 614, italics added.)

Even if we were convinced that the definition of the term in Civil Code section 1039 was the only permissible definition of the term "transfer," *San Pedro, L.A. & S.L.R. Co. v. Hamilton* (1911)

161 Cal. 610, does not change our analysis. *Hamilton* did not comment on the meaning of the term "transfer" as defined by section 1039. Instead, the *Hamilton* case determined that in the context of constitutional interpretation if a "word [has] a technical[,] as well as popular meaning, the latter will be given it[,] unless the context forces the conclusion that it was otherwise used." (*Id.* at p. 617.) The Court then construed constitutional language that did not include the word "transfer," stating that "in the ordinary and general acceptation of the word 'grant' and of the word 'sale,' and particularly where the two are used in conjunction, as here, they convey the idea of parting with the fee for a monetary or other consideration, and do not embrace the concept of a lease." (*Ibid.*) "Only by a resort to meanings given to the words in extreme cases, and not to their generally accepted meaning," the Court said, "can they be stretched to cover and include the idea of leasing." (*Id.* at p. 618.) *Hamilton* is inapposite; it supported a constitutional construction based on the generally accepted meaning of a term rather than the statutory meaning of the term, and *nothing* in the <u>Hamilton</u> case turned on the definition of the word "transfer."

We also remain mindful that the First Offer Clause's triggering language does not *only* include the word "transfer." The First Offer Clause's initial trigger language centers on SCST's "desire to *sell or transfer* the [campus] or any portion thereof . . . ." (Italics added.) We must construe the First Offer Clause " 'to give force and effect, not only to every clause but to every word in it, so that no clause or word may become redundant . . . .' " (*Pico Citizens Bank v. Tafco, Inc.* (1958) 165 Cal.App.2d 739, 746.) At SCST's urging, the trial court construed the term "transfer" in isolation. That construction, however, essentially

31

limited the definition of "transfer" in the First Offer Clause to an event that would accompany a sale.  Giving effect to the First Offer Clause's language further suggests to us that Claremont and SCST intended to include transactions *other* than only those that would convey a fee simple estate in the "sell or transfer" triggering language.

By any of the measures that we construe the term "transfer"—and we expressly limit our construction of the term to the parties' use of it in and with the context of the First Offer Clause—the lease agreement attached to Claremont's FAC purports to have transferred property interests, including immediate possession of the property, to Yalong.[12]  Specifically, we conclude that the lease agreement between SCST and Yalong is a transfer that triggers the First Offer Clause.  By any of these measures, then, the allegations in the FAC are sufficient to state causes of action for breach of the 1957 Agreement (first cause of action), the 1957 deed (second cause of action), and the 2001 agreement (third cause of action), and to support causes of action for specific performance of the First Offer Clause (sixth cause of action), and declaratory relief based on First Offer Clause (ninth cause of action).  We will reverse the trial court's order sustaining demurrers to these causes of action.

### ii. The FAC alleges SCST's "Desire" to Sell or Transfer

Claremont argues here that SCST triggered the First Offer Clause before it purportedly leased the property to Yalong. Claremont attached to the FAC a property listing and an Offering

---

[12] Indeed, the trial court judicially noticed interrogatory responses by Yalong identifying SCST's campus address as Yalong's principal place of business.

Memorandum through which SCST, beginning in January 2018, sought offers for the sale or lease of its campus. Claremont contends, and alleged in the FAC, that the listing and Offering Memorandum evidenced SCST's "desire to sell or transfer" its campus, and therefore activated part of the triggering language in the First Offer Clause—"That if [SCST] . . . *desire*[*s*] *to sell or transfer* the said real property or any portion thereof[.]"

For its part, SCST relies on its interpretation of the term "transfer" and argues that the lease is not a transfer. By extension, according to SCST, an offer to lease the property cannot evidence a desire to "sell or transfer," even if the lease itself contains a "Purchase Obligation."

The FAC alleges the terms of three different contracts (the existence of a contract); it alleges that Claremont has fully performed its obligations under those contracts (the 1957 Agreement, the 1957 deed, and the 2001 agreement); it alleges the conduct that it contends constituted a breach; and it alleges damages. Specifically, the FAC alleges that SCST "triggered the [First Offer Clause] by, among other things, 'desir[ing] to sell or transfer' the Subject Property, entering into the [lease] with Yalong, and ceasing to use the Subject Property as 'its principal place of carrying on its activities.'"

*Regardless of our conclusion that a lease may constitute a transfer as the parties used that term in the First Offer Clause,* the allegations in the FAC were sufficient to allege causes of action for breaches of the contracts, specific performance of the First Offer Clause, and declaratory relief under Claremont's "desire to sell or transfer" theory. The FAC's allegations, specifically citing language in a property listing, alleged that SCST had formed the present "desire" to sell the property. The

33

documents attached to the FAC bear that out.  A property listing that sought offers for the sale or lease of the campus would be sufficient to support Claremont's cause of action.  But Claremont also attached an actual lease of the property that contained *not only* a "Purchase Obligation"—a fully-formed sale agreement that SCST and Yalong intended to *imminently* effect—but *also* an "Option to Purchase" that makes clear that even if the Purchase Obligation is somehow thwarted that Yalong retains throughout the entire lease term the option to purchase the property if that ever becomes feasible.

### c. Injunctive Relief

The tenth cause of action in the FAC is a cause of action for preliminary and permanent injunction.

"Injunctive relief is a remedy, not a cause of action. [Citation.]  'A permanent injunction is an equitable remedy for certain torts or wrongful acts of a defendant where a damage remedy is inadequate.  A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action for tort or other wrongful act against a defendant and that equitable relief is appropriate.  A permanent injunction is not issued to maintain the status quo but is a final judgment on the merits.  [Citation.]  It is reviewed on appeal for the sufficiency of the evidence to support the judgment.  [Citation.]' [Citation.]  'A permanent injunction is merely a remedy for a proven cause of action.  It may not be issued if the underlying cause of action is not established.' " (*City of South Pasadena v. Department of Transportation* (1994) 29 Cal.App.4th 1280, 1293.)

Ultimately, while the complaint may contain a request for injunctive relief, it must be based on other causes of action and

34

cannot survive independently.  We will therefore affirm the trial court's order as it relates to the tenth cause of action.

### 3. Amendment

Claremont contends that the trial court abused its discretion when it denied leave to amend the FAC.  We do not reach this contention based on our conclusion that the trial court erred when it sustained SCST's demurrers to most of Claremont's causes of action.

We recognize, however, that the landscape of the parties' dispute may have changed significantly since Claremont filed the FAC.  We also recognize that litigation developments may have changed the significance of certain allegations, and have mooted others.  Because we recognize developments may have overtaken significant portions of the FAC, we will direct the trial court on remand to grant Claremont leave to amend its complaint.

## B. Claremont's Motion for Preliminary Injunction

### 1. Legal Standards

"In determining whether to issue a preliminary injunction, the trial court considers:  (1) the likelihood that the moving party will prevail on the merits and (2) the interim harm to the respective parties if an injunction is granted or denied.  The moving party must prevail on both factors to obtain an injunction.  Thus, where the trial court denies an injunction, its ruling should be affirmed if it correctly found the moving party failed to satisfy either of the factors.  [Citation.]

"Where the evidence before the trial court was in conflict, its factual determinations, whether express or implied, are reviewed for substantial evidence.  We interpret the facts in the light most favorable to the prevailing party.  [Citation.]

35

"Generally, the standard of review for denial of a preliminary injunction is whether the trial court committed an abuse of discretion." (*Sahlolbei v. Providence Healthcare, Inc.* (2003) 112 Cal.App.4th 1137, 1145-1146.)

"All exercises of discretion," however, "must be guided by applicable legal principles . . . .  [Citations.]  If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.]  Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal." (*Farmers Ins. Exchange v. Superior Court* (2013) 218 Cal.App.4th 96, 106; see *Great West Contractors, Inc. v. Irvine Unified School Dist.* (2010) 187 Cal.App.4th 1425, 1459-1460 [collecting cases].)

Where the trial court incorrectly applies legal principles of contract interpretation, rulings premised on incorrect interpretations constitute an abuse of the court's discretion. (*Costa Serena Owners Coalition v. Costa Serena Architectural Com.* (2009) 175 Cal.App.4th 1175, 1203.)

### 2. Analysis

The trial court based its conclusion on both Claremont's likelihood of prevailing on the merits and Claremont's demonstration of interim harm on its conclusion that the SCST-Yalong lease did not implicate the First Offer Clause.  Citing Civil Code section 1039—the same section analyzed above—the trial court incorrectly concluded that the lease was not a "transfer" within the meaning of the First Offer Clause.  The trial court applied that conclusion both to its analysis of Claremont's

36

likelihood of success on the merits and whether Claremont had demonstrated interim harm.

We have concluded that the trial court's interpretation of the term "transfer" as the parties used it and in the context of the First Offer Clause was incorrect. The trial court's order denying the motion for preliminary injunction was, therefore, premised on an "incorrect interpretation" of the First Offer Clause and constitutes an abuse of its discretion. We will reverse the trial court's order.

## DISPOSITION

The judgment is reversed. The trial court's order sustaining SCST's demurrers is reversed as to the FAC's first, second, third, sixth and ninth causes of action. The trial court's order sustaining SCST's demurrers is affirmed as to the seventh and tenth causes of action. On remand, the trial court will grant Claremont leave to file an amended complaint. The trial court's order denying Claremont's motion for preliminary injunction is reversed. On remand, the trial court will allow Claremont to file a renewed motion for preliminary injunction reflecting the current circumstances of the dispute, and the trial court will consider Claremont's motion in light of this opinion. Claremont is awarded its costs on appeal.

NOT TO BE PUBLISHED


CHANEY, J.

We concur:


ROTHSCHILD, P. J.        BENDIX, J.